*Notice: This opinion is subject to correction before publication in the PACIFIC REPORTER. Readers are requested to bring errors to the attention of the Clerk of the Appellate Courts, 303 K Street, Anchorage, Alaska 99501, phone (907) 264-0608, fax (907) 264-0878, email corrections@appellate.courts.state.ak.us.*

THE SUPREME COURT OF THE STATE OF ALASKA

| | | |
|---|---|---|
| CALAIS COMPANY, INC., | ) | |
| | ) | Supreme Court No. S-13884 |
| Appellant, | ) | |
| | ) | Superior Court No.  3AN-07-08813 CI |
| v. | ) | |
| | ) | O P I N I O N |
| DEBORAH KYZER IVY, | ) | |
| individually and as a Derivative | ) | No. 6784 – May 31, 2013 |
| Plaintiff on behalf of the interests | ) | |
| of CALAIS COMPANY, INC. and | ) | |
| its SHAREHOLDERS, | ) | |
| | ) | |
| Appellee. | ) | |
| | ) | |

Appeal from the Superior Court of the State of Alaska, Third Judicial District, Anchorage, William F. Morse, Judge.

Appearances: Jeffrey M. Feldman and Susan Orlansky, Feldman Orlansky & Sanders, Anchorage, for Appellant. Phillip Paul Weidner, Weidner & Associates, Anchorage, and Charles E. Cole, Law Offices of Charles E. Cole, Fairbanks, for Appellee.

Before:  Fabe, Winfree, and Stowers, Justices.  [Carpeneti, Chief Justice, and Christen, Justice, not participating.]

STOWERS, Justice.

## I.   INTRODUCTION

In 2007, Deborah Kyzer Ivy, a shareholder of Calais Company, Inc. (Calais), filed a complaint against Calais seeking involuntary corporate dissolution. In May 2009, Ivy and Calais reached a settlement agreement (Agreement) in which Calais agreed to purchase Ivy's shares at "fair value" as determined by a three-member panel of appraisers. The appraisers disagreed over the fair value of Calais. Two of the appraisers agreed the fair value of Calais was $92.5 million; one appraiser dissented, valuing Calais at $43 million.

Calais sought to enforce the Agreement in superior court, arguing the two majority appraisers had failed to comply with the appraisal procedure mandated by the Agreement and the Agreement's definition of "fair value." The superior court ultimately declined to rule on the issue, concluding that interpreting the term "fair value" was beyond its scope of authority under the terms of the Agreement. Consequently, the court ordered Calais to purchase Ivy's shares based on the majority appraisers' valuation.

Calais appeals. We reverse the superior court's final order and remand for the court to remand to the appraisers with explicit instructions to calculate the "fair value" of Calais as defined by AS 10.06.630(a), as required by the Agreement.

## II.   FACTS & PROCEEDINGS

Calais does business in real estate acquisition, development, rental, and leasing, and owns "significant tracts of land" in Anchorage. In 2007, Ivy — one of 30 individual stockholders and owner of 6.25% of Calais stock — filed a complaint against Calais; her complaint seeking involuntary dissolution under AS 10.06.628 included both personal and derivative claims.[1] In May 2009 the parties reached a settlement

---

[1]     Alaska Statute 10.06.628(b) states that the grounds for involuntary dissolution are:

(continued...)

agreement.

## A. Settlement Agreement

Under the Agreement, Ivy agreed to dismiss her claims and Calais agreed

---

[1](...continued)

(1) the corporation has abandoned its business for more than one year;

(2) the corporation has an even number of directors who are equally divided and cannot agree as to the management of its affairs, so that its business can no longer be conducted to advantage or so that there is danger that its property and business will be impaired or lost, and the holders of the voting shares of the corporation are so divided into factions that they cannot elect a board consisting of an uneven number;

(3) there is internal dissension and two or more factions of shareholders in the corporation are so deadlocked that its business can no longer be conducted with advantage to its shareholders, or the shareholders have failed at two consecutive annual meetings at which all voting power was exercised to elect successors to directors whose terms have expired or would have expired upon election of their successors;

(4) those in control of the corporation have been guilty of or have knowingly countenanced persistent and pervasive fraud, mismanagement or abuse of authority or persistent unfairness toward shareholders, or the property of the corporation is being misapplied or wasted by its directors or officers;

(5) in the case of any corporation with 35 or fewer shareholders of record, liquidation is reasonably necessary for the protection of the rights or interests of the complaining shareholder or shareholders; or

(6) the period for which the corporation was formed has terminated without extension.

to purchase all of Ivy's shares of Calais stock. Paragraph 5 of the Agreement described the procedure for valuing Ivy's shares. Calais and Ivy were to each nominate one appraiser, and these two appraisers were to select a third. The appraisers were to "determine the fair value of Calais in accordance with [the] Settlement Agreement and AS 10.06.630(a),[2] as of the date of [the] Settlement" using "their expertise and judgment" and "giving due consideration to all Calais liabilities and to the fair market value of all Calais assets." In arriving at the "appraised fair value of Calais," the appraisers were not to apply any discount due to the number of shareholders or distribution of shares, nor consider the "impact or value of any speculative future development of Calais property or assets, or any speculative projected or assumed profits or revenues that might be derived from any future development of Calais property or assets." The appraisers could, however, "consider future opportunities to develop the property, subject to all existing leases and commitments, to the extent and only to the

_____

[2] Alaska Statute 10.06.630(a) states:

> Subject to a contrary provision in the articles of incorporation, in a suit for involuntary dissolution under AS 10.06.628 the corporation or, if it does not elect to purchase, the holders of 50 percent or more of the voting power of the corporation, the "purchasing parties", may avoid the dissolution of the corporation and the appointment of a receiver by purchasing for cash the shares owned by the plaintiffs, the "moving parties", at their fair value. *The fair value shall be determined on the basis of the liquidation value, taking into account the possibility of sale of the entire business as a going concern in a liquidation.* The election of the corporation to purchase may be made by the approval of the outstanding shares excluding shares held by the moving parties.

(Emphasis added.)

extent that those future opportunities impact the fair value of the property as of the appraisal date."

The appraisers were to prepare "a final report stating the appraised value of the fair value of Calais under the[se] criteria." The value of Ivy's shares were then to be determined by calculating 6.25% of the appraised fair value of Calais. Paragraph 5(d) of the Agreement states: "An agreement on the value of Calais need only be reached by two of the three appraisers, and that valuation shall be binding on the parties and shall not be subject to any further review, dispute, or appeal." But Paragraph 23 of the Agreement states:

> Superior Court Judge William Morse shall retain jurisdiction over this matter for the purpose of enforcing all terms and conditions of this Settlement Agreement . . . . Should a dispute arise concerning any aspect of this Agreement, and should any party seek judicial assistance to secure enforcement of the Agreement, the Court, in its discretion, may award full reasonable and appropriate costs and attorney's fees to the prevailing party in the dispute, in connection with resolution of the dispute.

B. **Appraisal And Dissent**

Ivy named Steve MacSwain and Calais named Timothy Lowe as their respective appraisers; MacSwain and Lowe selected Kenneth Gain as the third appraiser. In November 2009 MacSwain and Gain reported that they both agreed on the appraised "fair market value" of Calais "when valued in accordance with the Settlement Agreement." They appraised the value at $92.5 million; Lowe disagreed, appraising Calais's value at $43 million.

Lowe explained in a dissent that he believed MacSwain and Gain's agreed-upon fair market value did not comply with the instructions of the Agreement or AS 10.06.630(a) because they omitted: (1) the capital gains tax liability for Calais's

appreciated real property; (2) the actual costs that would be incurred in the liquidation of the company; and (3) the time value of money during the disposition or liquidation period. Lowe also explained that both MacSwain and Gain were unwilling to consider or acknowledge their omission of these costs after Lowe encouraged them to do so, explaining that both were "valuing the equity of [Calais] as a direct real property interest and not as equity in a corporation [and] only in the context of market value and not in the mandated context of liquidation value." Lowe clarified his belief that the appraisal panel's assignment under the Agreement was to determine the fair value of Calais on a liquidation basis, as defined by AS 10.06.630(a), not the fair market value of Calais's assets. Lowe concluded that the value agreed upon by MacSwain and Gain should be set aside or be subject to further review because it did not provide a reliable estimate of the fair value of Calais.

## C. First Motion To Enforce

In December 2009 Calais filed a motion in the superior court to enforce the Agreement. Calais asked the court to find that the appraisers had not followed the procedures set forth in the Agreement and to remand the appraisal to the appraisers with directions to comply with the Agreement's instructions to determine Calais's fair value by taking into account liquidation costs, including capital gains tax liabilities. Ivy opposed Calais's motion, contending the Agreement did not authorize review by the court.

Superior Court Judge William F. Morse granted Calais's motion in part, setting forth his findings and conclusions on February 2, 2010. The court distinguished between reviewing the appraisers' valuation, which it believed it was prohibited from doing under the terms of the Agreement, and reviewing the appraisers' process in making the valuation to determine whether the appraisers had complied with the procedures and standards outlined in the Agreement. The court concluded that the parties' explicit grant

-6- **6784**

of authority to enforce the Agreement authorized the court to review the appraisers'
procedures for compliance with the Agreement. The superior court reviewed the
Agreement and determined that the parties intended the appraisers to determine the "fair
value of Calais" as defined by AS 10.06.630(a), not the "fair market value" of Calais's
assets. The court then issued a limited order directing the parties to "advise the panel
that it should again evaluate the fair value of Calais" and to convey to the panel
instructions that the court had drafted,[3] which included paragraphs from the Agreement

---

[3]   The superior court's instructions to the appraisal panel provided:

You are instructed to determine the "fair value of Calais" in
accordance with the Settlement Agreement and
AS 10.06.630(a), as of the date of the Settlement,
May 15, 2009. This means that you must prepare your
appraisal in accordance with the provisions of both the
Settlement Agreement and AS 10.06.630(a).

To be "in accordance with the Settlement Agreement," your
determination must comply with Paragraphs 5(a) and (b) of
the Settlement Agreement, which state, in relevant part:

(a) . . . [T]he appraisers shall exercise their expertise and
judgment in that determination [of fair value], giving due
consideration to all Calais' liabilities, and to the fair market
value of all Calais' assets. The appraisers shall make their
determination of the fair value of Calais without input or
communication from Calais or the Defendants or Ivy, either
orally or in writing, except as provided by Paragraph 5(e).

(b)      In arriving at the appraised fair values of Calais there
shall be: 1) no discount as to appraising fair value of Calais
due to the number of shareholders or dilution of ownership of
shares; 2) no consideration by the appraisers of the impact or
value of any speculative future development of Calais
property or assets, but the appraisers may consider future
opportunities to develop the property, subject to all existing

(continued...)

and AS 10.06.630(a).

Following the court's February 2010 order, Lowe made repeated attempts to communicate with MacSwain and Gain. MacSwain and Gain each sent brief e-mails to Lowe regarding their continued involvement as appraisers, but those e-mails did not respond to any of Lowe's substantive questions or concerns regarding the appraisal process and the superior court's order. Lowe also asked the parties' counsel and the court to assist him in getting the appraisal panel to work together, but the appraisal panel never met following the February 2010 order.

On April 6, 2010, MacSwain and Gain sent a response to the court in which they concluded that "fair value," "fair market value," and "market value" are synonymous. They also asserted that deductions for tax consequences and transaction costs were not appropriate when determining the fair value of Calais because they had not been explicitly asked to make such deductions. They made no reference to the definition of "fair value" in AS 10.06.630(a).

Lowe prepared a separate response to the court's February 2010 order and a report that described MacSwain and Gain's erroneous procedures and analysis, their

---

[3](...continued)
leases and commitments, to the extent and only to the extent that those future opportunities impact the fair values of the property as of [May 15, 2009].

To be "in accordance with AS 10.06.630(a)," your determination must comply with AS 10.06.630(a) which provides, in relevant part:

(a) . . . The fair value shall be determined on the basis of the liquidation value, taking into account the possibility of sale of the entire business as a going concern in a liquidation.

refusal to work as a panel, and their general disregard of the Agreement's prescribed procedures and directions.

### D.    Second Motion To Enforce

On April 8, 2010, Calais filed a second motion to enforce, asserting that the majority appraisers still had not complied with the Agreement's procedures for valuing Calais or with the court's February 2010 order. Specifically, Calais claimed that the majority: (1) had not complied with the requirement to use the definition of "fair value" in AS 10.06.630(a); and (2) had violated the court's "express directive that the matter be decided by 'the panel' — not by the majority members acting on their own." Calais asked the court to reject the majority appraisers' report and to enforce the Agreement by ensuring that fair value was determined in accordance with the terms and procedures of the Agreement. Ivy filed a cross-motion to enforce the Agreement, asking the court to order Calais to pay her 6.25% of the valuation determined by the majority appraisers.

In June 2010 the superior court denied Calais's motion and granted Ivy's, concluding that it had no authority under the Agreement to do anything further. The court concluded that choosing between the majority appraisers' definition of "fair value" and the dissent appraiser's definition of "fair value" and declaring that one or the other complied with the Agreement would be outside the scope of authority delegated to the superior court to enforce the Agreement. The court made no findings or conclusions regarding the majority appraisers' failure to include Lowe in the appraisal process following the February 2010 order.

The superior court issued a final order in July 2010, reaffirming that its June 2010 order would be the court's final action. Calais appeals.

## III. STANDARD OF REVIEW

We interpret settlement agreements as contracts.[4] The interpretation of contractual terms is a question of law, which we review de novo.[5]

## IV. DISCUSSION

The preliminary issue in this appeal is whether the superior court had authority to review the procedures and methodology employed by the three-person appraisal panel under paragraph 23 of the Agreement. This paragraph explicitly grants "jurisdiction"[6] to the superior court to enforce "all terms and conditions" of the Agreement, notwithstanding paragraph 5(d), which states that a valuation agreed upon by two of the appraisers would be "binding on the parties" and not "subject to any further review, dispute, or appeal." The second issue presented for review is whether the majority appraisers' definition of "fair value" and exclusion of Calais's appraiser from the appraisal and reappraisal processes violated the express terms of the Agreement.

Because paragraph 23 of the Agreement expressly provides the superior

---

[4] *Chilkoot Lumber Co. v. Rainbow Glacier Seafoods, Inc.*, 252 P.3d 1011, 1014 (Alaska 2011).

[5] *See Smith v. Cleary*, 24 P.3d 1245, 1247 (Alaska 2001) ("The settlement agreement's scope and effect raise questions of contract law that we review de novo.").

[6] While the Agreement explicitly grants "jurisdiction" to the superior court, this is an incorrect characterization because once the parties invoke the jurisdiction of the court by filing suit, jurisdiction is always held by the court. *See Sea Hawk Seafoods, Inc. v. State*, 215 P.3d 333, 338 (Alaska 2009) ("[A] court has subject-matter jurisdiction over a case when it has 'the legal authority . . . to hear and decide [that] particular type of case.' . . . AS 22.10.020(a) provides that the superior court has 'jurisdiction in all civil and criminal matters.' ") (internal citations omitted); *see also* 21 C.J.S. *Courts* § 98 (2012) ("In general, jurisdiction once acquired is not lost or divested by subsequent events."). Instead, we use the word "authority" since a contract may limit a court's authority to review it.

-10- 6784

court with continuing authority to enforce "all terms and conditions" of the Agreement "[s]hould a dispute arise concerning any aspect of th[e] Agreement," the superior court has authority to interpret the Agreement and review whether the appraisers complied with the process and terms for determining fair value.  Because the majority appraisers' definition of "fair value" violates the express terms of the Agreement, we reverse the superior court's order and remand to the superior court to remand to the appraisers with instructions to follow the Agreement's instructions regarding both appraisal procedures and fair value determination.

A. **The Superior Court Has The Authority To Determine Whether The Appraisers Complied With The Terms Of The Settlement Agreement.**

Although the parties agree that the superior court did not have authority under the Agreement to review the majority appraisers' valuation of Calais, the parties dispute whether the superior court had authority to review the majority appraisers' valuation process or methodology.

Ivy argues that under the Agreement neither the superior court nor this court has the authority to review the majority appraisers' "exercise of their judgment, expertise, or methods employed" in reaching their determination of Calais's value. Specifically, Ivy contends that the majority appraisers' valuation of Calais is binding and non-reviewable because both parties "gave up certain rights in exchange for gaining other rights" when they agreed to waive further review of the majority appraisers' determination of the fair value of Calais, including the judgment and methods the majority appraisers used to calculate the fair value.  According to Ivy, this forfeiture of rights was "an important element of consideration for [the] entire [Agreement]."

Calais argues that paragraph 5(d) of the Agreement does not foreclose all judicial review of the appraisal process because paragraph 23 expressly grants the

superior court "jurisdiction" to "enforce," meaning to "carry out effectively,"[7] all terms and conditions of the Agreement.

Whether an appraisal conducted pursuant to a contractual settlement agreement may be subject to review by the trial court generally presents a question that is governed by the language of the settlement agreement. In this case, paragraph 23 of the Agreement expressly granted authority to the superior court to enforce the terms of the Agreement, and the Agreement included specific terms setting forth the procedures to be used by the appraisal panel in determining the fair value of Calais.

**1. Paragraph 23 of the Agreement expressly grants the superior court authority to enforce the terms of the Agreement, including the terms that expressly govern the appraisal procedure.**

Ivy argues that the enforcement clause in paragraph 23 of the Agreement "simply allows [the] Trial Court to provide [the] Parties relief to enforce [the Agreement's] provisions as to consideration."[8] But Ivy does not provide any contractual language, extrinsic evidence, or legal authority to support her assertion that paragraph 23 only refers to consideration provisions. And paragraph 23's phrase "[s]hould a dispute arise concerning *any aspect* of this Agreement" directly contravenes Ivy's interpretation. (Emphasis added.) "Any aspect" means "any aspect."

In *Salt Lake Tribune Publishing Co. v. Management Planning, Inc.*, a party argued that an appraisal of a newspaper's assets was not subject to judicial review

---

[7] Calais cites WEBSTER'S NINTH NEW COLLEGIATE DICTIONARY at 412 (1987) for this definition of "enforce."

[8] The consideration provisions Ivy specifically points to are: "payment of money; transfer of stock out of Escrow to Calais; releases; termination of association by Ivy with Calais and Calais with Ivy; no further claims; release of Stipulation to Dismiss from Escrow and filing with and signing by Court; prohibiting future contact involvement by Ivy regarding with Calais, etc."

because the parties' agreement stated the appraisal was "final, binding, and conclusive."[9] The Tenth Circuit rejected this argument because it ignored other terms in the agreement: The agreement expressly allowed the parties to enforce the agreement in any court and provided that the appraisal was binding only if it complied with the appraisal provisions in the agreement, such as the agreement's definition of "fair market value."[10] The Tenth Circuit concluded that the trial court had authority to "review the appraisal for the appraiser's compliance with the contractual terms."[11]

Like the contract in *Salt Lake Tribune*, the Agreement here specifically allows the parties to enforce its terms in the superior court and even provides for costs and attorney's fees "[s]hould a dispute arise concerning any aspect of this Agreement . . . ." And the Agreement includes specific terms regarding the appraisal process, requiring the appraisers to determine the "fair value" of Calais "in accordance with [the] Agreement and AS 10.06.630(a)." Judicial review of the appraisers' process to determine whether they complied with the express terms of the Agreement is therefore proper.

**2.      Courts in other jurisdictions have held that appraisal clauses are generally reviewable for fraud, bad faith, material mistake, or a failure to understand or complete the contractually assigned task.**

Courts in other jurisdictions have held that there are key distinctions between an arbitration process, which is generally non-reviewable, and an appraisal

---

[9]      454 F.3d 1128, 1136-37 (10th Cir. 2006).

[10]      *Id*. at 1137.

[11]      *Id*. at 1138 (citing *Melton Bros., Inc. v. Philadelphia Fire & Marine Ins. Co.*, 144 A. 726 (N.J. 1929)).

process, which is generally reviewable under limited circumstances.[12]  The Wisconsin Supreme Court recently discussed the unique characteristics of appraisals and described what it believed the court's role should be in reviewing appraisal awards:

> The court's role is not to determine whether the third party [appraisers] accurately valued the item (as if the court itself could do a better job), but whether the third party experts understood and carried out the contractually assigned task. The obvious point of contracting for an appraisal process is to keep a jury or court out of that decision.  Courts have an obligation to enforce this aspect of an agreement between the parties by asserting only limited power to review appraisal awards.[13]

The Wisconsin court also noted that appraisals deserve a more deferential review because the appraisal process is a "fair and efficient tool for resolving disputes."[14]  But the court ultimately concluded that, although appraisals are presumptively valid and should not be "lightly set aside," an appraisal may be set aside upon a showing of "fraud, bad faith, a material mistake, or *a lack of understanding or completion of the*

---

**12**  *See, e.g.*, *Cas. Indem. Exch. v. Yother*. 439 So. 2d 77, 79-80 (Ala. 1983) (noting that an appraisal is distinguishable from arbitration and is not subject to the various procedural requirements imposed on the arbitration process); *Minot Town & Country v. Fireman's Fund Ins. Co.*, 587 N.W.2d 189, 190 (N.D. 1998) (noting that while both appraisal and arbitration are proceedings designed to effect speedy and efficient resolutions in lieu of judicial proceedings, there are key distinctions between the two; for example, arbitration is a quasi-judicial proceeding that ordinarily decides the entire controversy while appraisal establishes only the amount of a loss and not liability for the loss); *Miller v. USAA Cas. Ins. Co.*, 44 P.3d 663, 673 (Utah 2002) (noting the intrinsic differences between appraisal and arbitration).

**13**  *Farmers Auto. Ins. Ass'n v. Union Pac. Ry. Co.*, 768 N.W.2d 596, 607 (Wis. 2009).

**14**  *Id.*

*contractually assigned task.*"[15] Courts in the District of Columbia, Iowa, Massachusetts, and Texas have reached similar conclusions and reviewed appraisals for fraud, bad faith, mistake, or failure to complete the appraisal according to the contractually prescribed appraisal procedures.[16]

As we explain below, the majority appraisers' response to the superior court's February 2010 order demonstrates "a lack of understanding or completion of the contractually assigned task."[17] As courts in other jurisdictions have held, this issue is judicially reviewable. We therefore hold that the superior court has the authority to determine whether the appraisers' process complied with the contractual terms of the Agreement and, if it did not, enforce the terms of the Agreement.

> **B.** **The Majority Appraisers Failed To Comply With The Agreement's Requirement That The Appraisers Determine The Fair Value Of Calais In Accordance With AS 10.06.630(a).**

As previously discussed, the superior court initially determined that the

---

[15] *Id.* (emphasis added).

[16] *See Wash. Auto. Co. v. 1828 L St. Assocs.*, 906 A.2d 869, 875 n.3 (D.C. 2006) (holding that a court will not set aside an appraiser's valuation unless appraisers have "mistaken their authority, departed from the submission, clearly misconceived their duties, acted upon some fundamental and apparent mistake, or have been moved by fraud or bias"); *Cent. Life Ins. Co. v. Aetna Cas. & Sur. Co.*, 466 N.W.2d 257, 260 (Iowa 1991) ("The [appraisal] award will not be set aside unless the complaining party shows fraud, mistake or misfeasance on the part of the appraiser or umpire."); *Nelson v. Maiorana*, 478 N.E.2d 945, 947 (Mass. 1985) (holding a court is justified in overturning an appraisal determination only when evidence supports a finding of "fraud, corruption, dishonesty, or bad faith in the appraisal process or decision"); *Wells v. Am. States Preferred Ins. Co.*, 919 S.W.2d 679, 683 (Tex. App. 1996) (recognizing an appraisal award is not binding if "the award was the result of fraud, accident, or mistake" or "was not made in substantial compliance with the terms of the contract").

[17] *Farmers Auto. Ins. Ass'n*, 768 N.W.2d at 607.

plain language of the Agreement showed the parties "intended that the appraisers utilize the statutory definition of 'fair value' " in AS 10.06.630(a) and directed the panel to reappraise Calais's fair value "in accordance with the provisions of both the Settlement Agreement and AS 10.06.630(a)."[18] After MacSwain and Gain responded that they had understood and complied with the Agreement's provisions, the superior court concluded that "to inquire further into the merits of the panel's action or construction of AS 10.06.630(a) would . . . exceed the authority granted to it by the parties' Settlement Agreement."

Calais argues that the superior court should have interpreted the meaning of "fair value" within the context of the Agreement in order to determine whether the appraisers had complied with the court's instructions. Calais argues the court should have concluded that the Agreement's use of the term "fair value," the Agreement's requirement that all liabilities be taken into account, and the Agreement's citation to AS 10.06.630(a) "together require[d] deductions for capital gains tax liabilities and other costs of liquidation." In response, Ivy argues that neither the superior court nor this court has authority to define "fair value" in the context of the Agreement, and she contends that the "meaning and effect" of the term "fair value" was "committed to [the] sole discretion and expertise" of the appraisers using their own experience, expert opinions, and principles of the profession.

### 1. The court has the authority to interpret the term "fair value" within the context of the Agreement.

We reiterate that under the plain language of the Agreement and persuasive case law from other jurisdictions, the court has the authority to resolve disputes concerning "any aspect" of the Agreement, enforce "all terms and conditions" of the

---

[18] *See supra* note 3 for the text of the superior court's order.

agreement, and review the appraisers' process to determine whether they complied with the Agreement's provisions. The superior court (and this court) has the authority to construe the term "fair value" within the context of the Agreement. Interpreting a contractual term is a legal question for the court,[19] not for the appraisers.

### 2. The plain language of the Agreement shows the parties intended "fair value" to mean "liquidation value."

"The objective of contract interpretation is to determine and enforce the reasonable expectations of the parties."[20] When interpreting contracts, we "[consider] the contract's language as well as relevant extrinsic evidence . . . ."[21] "The parties' expectations are assessed by examining the language used in the contract, case law interpreting similar language, and relevant extrinsic evidence, including subsequent conduct of the parties."[22]

The Agreement is unambiguous — it plainly states that the parties intended the appraisers to "determine the fair value of Calais in accordance with . . . AS 10.06.630(a)," which provides that "fair value shall be determined on the basis of the liquidation value, taking into account the possibility of sale of the entire business as a going concern in a liquidation." The superior court correctly recognized this in its first order:

> The Agreement's reference to AS 10.06.630(a) is telling. That subsection describes a mechanism for majority shareholders to avoid the dissolution of a corporation at the

---

[19] *See Smith v. Cleary*, 24 P.3d 1245, 1247 (Alaska 2001).

[20] *Norville v. Carr-Gottstein Foods Co.*, 84 P.3d 996, 1004 (Alaska 2004).

[21] *Sowinski v. Walker*, 198 P.3d 1134, 1143-44 (Alaska 2008).

[22] *Norville*, 84 P.3d at 1004 (quoting *Municipality of Anchorage v. Gentile*, 922 P.2d 248, 256 (1996)).

request of a minority shareholder by the purchase for cash of the minority's shares "at their fair value," which is to be "determined on the basis of liquidation value, taking into account the possibility of sale of the entire business as a going concern in a liquidation."[23]

In their response to the superior court, the majority appraisers interpreted "fair value" as synonymous with "fair market value." But the Agreement differentiates between the two, stating the appraisers shall "determine the *fair value* of Calais in accordance with . . . AS 10.06.630(a)," while "giving due consideration to all Calais liabilities and to the *fair market value* of all Calais assets." (Emphasis added.) By the Agreement's terms, the "fair market value" of Calais's assets is just one factor to be considered in determining the ultimate "fair value" of Calais. To interpret "fair market value" as synonymous with "fair value," as the majority appraisers suggest, would render the Agreement's distinction meaningless, which would be contrary to our rules of contract interpretation.[24]

---

[23] It is clear from the appraisers' correspondence and methodology that they were not appraising Calais under the going concern option, but rather under the liquidation of assets option.

[24] *See Rockstad v. Global Fin. & Inv. Co.*, 41 P.3d 583, 592-93 (Alaska 2002) ("[T]his definition is excluded . . . by the rule disfavoring interpretations that leave contract terms meaningless."). Additionally, we note that the majority appraisers' assertion that "fair value, market value, and fair market value" are "virtually synonymous" is not supported by professional appraisal treatises. For example, one treatise notes that while "market value" is "essentially synonymous" with "fair market value," the term "fair value" in business valuations "is usually a legally created standard." SHANNON P. PRATT & ALINA V. NICULITA, VALUING A BUSINESS: THE ANALYSIS AND APPRAISAL OF CLOSELY HELD COMPANIES 42, 45 (5th ed. 2008). "In most states, fair value is the statutory standard of value applicable in cases of dissenting stockholders' appraisal rights" or in "the dissolution statutes of those states in which minority stockholders can trigger a corporate dissolution." *Id*. at 45. "[P]ublished

(continued...)

### 3. Cases construing "fair value" in the context of dissolution buyout statutes, rather than involuntary dissolution statutes, are not relevant.

There is no Alaska case law construing "fair value" under AS 10.06.630(a). Ivy cited several cases from other jurisdictions in her briefing to the superior court to support her assertion that capital gains taxes should not be deducted when determining the "fair value" of a corporation.[25] These cases discuss "fair value" in the context of dissenter buyout (in contrast to cases discussing "fair value" in the context of statutes governing buyout in lieu of involuntary dissolution) and reject deductions for capital gains tax liabilities and other costs of liquidation.[26] Calais persuasively argues that because Ivy's cases define "fair value" under dissenter buyout statutes, they are not relevant for interpreting how the parties here intended "fair value" to be defined: The

---

[24](...continued)
precedents established in various state courts *have not equated [fair value] directly to fair market value*"; therefore "[w]hen a situation arises of actual or potential stockholder dissent or dissolution action, it is necessary to carefully research the legal precedents applicable to each case" and to "solicit the view of counsel as to the interpretation of fair value." *Id.* (emphasis added). As this treatise explains, "fair value" is generally a statutory term that is not synonymous with "market value" and "fair market value." *See also* UNIFORM STANDARDS OF PROFESSIONAL APPRAISAL PRACTICE at 112-13 (2002) (quoting Appraisal Standards Board, AO-8 (1999)) (distinguishing "market value" from "fair value" in the context of real property appraisals and stating, "Rarely will market value and fair value be exactly the same").

[25]     *See Swope v. Siegel-Robert, Inc.*, 243 F.3d 486 (8th Cir. 2001); *Bogosian v. Woloohojian*, 158 F.3d 1 (1st Cir. 1998); *In re 75,629 Shares of Common Stock of Trapp Family Lodge, Inc.*, 725 A.2d 927 (Vt. 1999); *Matthew G. Norton Co. v. Smyth*, 51 P.3d 159 (Wash. App. 2002); *Brown v. Arp & Hammond Hardware Co.*, 141 P.3d 673 (Wyo. 2006).

[26]     *See Swope*, 243 F.3d at 491; *Bogosian*, 158 F.3d at 11; *Trapp Family Lodge*, 725 A.2d at 931; *Matthew G. Norton Co.*, 51 P.3d at 163; *Brown*, 141 P.3d at 688.

Agreement expressly refers to AS 10.06.630(a), which provides the mechanism for a corporation to avoid dissolution by purchasing the plaintiff's shares at fair value, and not AS 10.06.574-.580, Alaska's dissenter buyout statutes.

There appears to be minimal precedent discussing how to calculate "fair value" in the involuntary dissolution context. Calais cites an unpublished case from California interpreting an involuntary liquidation buyout statute similar to Alaska's statute in which the California court affirmed a fair value appraisal that deducted taxes and other liquidation expenses.[27]

We also look to the statutes governing liquidation of a corporation. Under AS 10.06.655(a)(1)-(2), a corporation is ready to dissolve when state taxes have been paid or provided for, "the other known debts and liabilities of the corporation have been paid or adequately provided for," and the remaining assets have been distributed. AS 10.06.665 states that after "all of the known debts and liabilities of a corporation in the process of winding up have been paid or adequately provided for," the remaining assets of the corporation shall be distributed to the shareholders according to their respective rights. It is hard to imagine how costs of sale and applicable income tax liabilities are not a part of this process.

Ivy asserts that because her rights were obtained through a settlement, fair value under AS 10.06.630(a) means something different than liquidation value under the dissolution statutes. However, Ivy sued under AS 10.06.628 for an involuntary dissolution; Calais was entitled to avoid the involuntary dissolution under AS 10.06.630

---

[27] *Khatkar v. Dhillon*, No. F053322, 2009 WL 189846, at *11-12 (Cal. App. Jan. 28, 2009) (citing *Abrams v. Abrams-Rubaloff & Assocs.*, 170 Cal. Rptr. 656 (Cal. App. 1980)) (affirming appraisal of fair value of plaintiffs' shares made pursuant to California's involuntary dissolution buyout statute that deducted taxes and other liquidation expenses).

by ultimately paying Ivy an estimated "fair value" of what she would have received had the corporation actually been required to liquidate and dissolve. The parties settled the lawsuit by specifically referring to fair value under AS 10.06.630(a). The provision in the Agreement for valuing the corporate assets at fair market value was the obvious bargained for difference in the normal liquidation process — under AS 10.06.660, corporate directors overseeing liquidation have the authority to sell or dispose of all or any part of the assets of the corporation as they deem reasonable, i.e., not necessarily at fair market value.

Though relevant case law is scarce, we conclude that Calais's argument is more persuasive. Because the Agreement specifically references Alaska's involuntary dissolution statute for purposes of determining "fair value," and because an appraisal of fair value under involuntary dissolution statutes deducts capital gains tax liabilities and other liquidation expenses, the appraisal of fair value in this case should also deduct these liabilities and expenses.

### 4. Summary

The court has the authority to interpret the Agreement and enforce its terms by determining whether the appraisal panel complied with the appraisal process mandated by the Agreement. The plain language of the Agreement demonstrates that the parties intended "fair value" to mean "liquidation value" under AS 10.06.630(a).[28]

---

[28] We agree with the superior court's analysis in its February 2, 2010 Order:

> The parties' decision to refer to the definition of "fair value"
> in AS 10.06.630(a) must have been meaningful and, in order
> that the parties' decision and Agreement are enforced, it has
> to be given effect. The parties' use of the term "fair value,"
> in their instructions to the appraisers "to determine the fair
> value of Calais" and the reference to a statutory definition of

(continued...)

Because the record shows that the majority appraisers did not take into account capital gains taxes or liquidation costs when they calculated the "fair value" of Calais, we remand the appraisal to the superior court to remand to the appraisal panel with explicit instructions to calculate "fair value" as defined by AS 10.06.630(a), the other terms of the Agreement, and this opinion.

### 5. The appraisal panel is required to work together as a panel.

Because the appraisal panel will need to determine "fair value" on remand, we take this opportunity to provide guidance to the superior court should the situation recur where one of the appraisers is excluded by the others from the appraisal process. Although the Agreement permits the final valuation of Calais to be determined by a majority of the three appraisers, the express terms of the Agreement indicate that the parties intended the panel of appraisers to be composed of three members at all times. The Agreement also refers to the appraisal procedure as a "process" in which all three appraisers would participate. The Agreement states that if one of the appraisers selected by Ivy or Calais became disabled or was "otherwise unable to complete the appraisal process," Ivy or Calais "shall have the right to select a substitute appraiser to begin the appraisal process anew," and that if the third appraiser became unable to serve, "a substitute appraiser shall be appointed by the court . . . ." The Agreement also states "the appraisers *as a group* may in their discretion communicate as needed with any other party, individual, or entity" for obtaining information necessary to complete "the appraisal process." (Emphasis added.)

The record reveals that MacSwain and Gain effectively excluded Lowe

---

[28](...continued)
> "fair value," can only reasonably be construed to mean the parties intended that the appraisers utilize the statutory definition of "fair value."

from the initial appraisal process and from discussions the two may have had following the superior court's February 2010 remand order. An appraisal panel works together like an arbitration panel or a panel of judges — the panel members may individually prepare, but they meet together as a panel to discuss their case and come to their decision. Just because one panel member dissents from the majority's consensus does not mean the majority may exclude the dissenter from meetings and deliberations of the panel. By the Agreement's terms, excluding Lowe violated the parties' intent that all three appraisers were to work together in an effort to come to an appraised fair value of Calais. The three were not required to agree, but they were required to work together as a panel in good faith.

On remand the superior court shall direct the appraisal panel to work together as a panel pursuant to the terms of the Agreement.

## V.     CONCLUSION

We REVERSE the superior court's final order. Because the majority appraisers failed to comply with the Agreement and its requirement that their appraisal of Calais's fair value be determined in accordance with the Agreement and AS 10.06.630(a), giving due consideration to all Calais liabilities, we REMAND the appraisal to the superior court to remand to the panel with instructions to calculate the fair value of Calais as defined by AS10.06.630(a), other terms of the Agreement, and this opinion. The court shall also direct the appraisal panel to work together as a panel in its appraisal process.