*Notice: This opinion is subject to correction before publication in the PACIFIC REPORTER. Readers are requested to bring errors to the attention of the Clerk of the Appellate Courts, 303 K Street, Anchorage, Alaska 99501, phone (907) 264-0608, fax (907) 264-0878, email corrections@akcourts.us.*

THE SUPREME COURT OF THE STATE OF ALASKA

| | | |
|---|---|---|
| DEBORAH KYZER IVY, Individually and as a Derivative Plaintiff on behalf of the interests of CALAIS COMPANY, INC., and its SHAREHOLDERS, | ) ) ) ) ) | Supreme Court No. S-15967 |
| | ) | Superior Court No. 3AN-07-08813 CI |
| Appellant, | ) | O P I N I O N |
| | ) | |
| v. | ) | No. 7176 – June 2, 2017 |
| | ) | |
| CALAIS COMPANY, INC., C.R. "KELLY" FOSS, Individually, and as a Shareholder and Former President and Board Member of CALAIS COMPANY, INC., JUDY FOSS, Individually and as President and Board Member and Shareholder of CALAIS COMPANY, INC., THE C.R. FOSS LIVING TRUST, McMAC FAMILY, LLP, THE RODNEY L. JOHNSTON TRUST, BRIAN W. DURRELL, Individually, and DURRELL LAW GROUP, PC, WELLS FARGO ALASKA TRUST COMPANY, NA, JOHN MCMANAMIN, as a Shareholder and Officer, and Former Officer and Board Member and General Manager of CALAIS COMPANY, INC. (but not individually), MATTHEW SWEENEY, Individually and as Putative Director of CALAIS COMPANY, INC., MICHAEL PETERSON, as a Board Member and Shareholder of CALAIS COMPANY, INC. (but not individually), and JANE/ JOHN DOE(S) I to XX | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | |



CONSPIRATORS,                         )
                                      )
            Appellees.                )
                                      )
_____     )

Appeal from the Superior Court of the State of Alaska, Third Judicial District, Anchorage, William F. Morse, Judge.

Appearances: Phillip Paul Weidner and Lisa Rosano, Phillip Paul Weidner & Associates, APC, Anchorage, and Charles E. Cole, Law Offices of Charles E. Cole, Fairbanks, for Appellant. Jeffrey M. Feldman, Summit Law Group, Seattle, Washington, and Susan Orlansky, Reeves Amodio LLC, Anchorage, for Appellees Calais Company, Inc., J. Foss, The C.R. Foss Living Trust, McMac Family, LLP, J. McManamin, M. Sweeney, and M. Peterson. Notice of nonparticipation filed by Patrick B. Gilmore, Atkinson, Conway & Gagnon, Anchorage, for Appellees B. Durrell and Durrell Law Group, PC. Notice of nonparticipation filed by Gary A. Zipkin and Michael S. McLaughlin, Guess & Rudd P.C., Anchorage, for Appellee Wells Fargo Alaska Trust Co., N.A. No appearance by Appellee Rodney L. Johnston Trust.

Before: Stowers, Chief Justice, Winfree, Bolger, and Carney, Justices. [Maassen, Justice, not participating.]

BOLGER, Justice.

# I.    INTRODUCTION

Deborah Ivy is a shareholder in Calais Company, Inc., a closely held corporation. Ivy sued Calais in 2007 seeking dissolution of the company. The parties settled, and Calais agreed to buy out Ivy's shares of the company based on a valuation of Calais conducted by a three-member appraisal panel. The appraisers returned an initial valuation in 2009. The superior court approved that valuation, but Calais appealed. We reversed and remanded, concluding that the appraisers had failed to

understand their contractually assigned duty. The appraisal panel returned a second valuation in October 2014, which the superior court again approved. Ivy now appeals, arguing (1) that on remand the superior court improperly instructed the appraisers; (2) that the appraisers made substantive errors in their valuation; and (3) that she is entitled to post-judgment interest. For the reasons explained below, we affirm the appraisal panel's valuation of Calais, but we reverse the superior court's denial of Ivy's request for post-judgment interest.

## II.     FACTS AND PROCEEDINGS

### A.     Prior Proceedings In *Calais Co. v. Ivy*

As this court summarized in *Calais Co. v. Ivy*,[1] Ivy filed suit against Calais in 2007 seeking involuntary dissolution of the corporation under AS 10.06.628. Calais owns several tracts of land in Anchorage and does business in real estate acquisition, development, rental, and leasing. The parties reached a settlement agreement (the Agreement) in 2009 in which Ivy agreed to dismiss all her claims and Calais agreed to purchase Ivy's shares of the company's stock based on a valuation of the company by a three-member appraisal panel. The Agreement required the appraisers to calculate the "fair value under AS 10.06.630(a)." That statute provides that "[t]he fair value shall be determined on the basis of the liquidation value, taking into account the possibility of sale of the entire business as a going concern in liquidation."[2] After the panel was assembled, two of the appraisers determined that the "fair market value" of Calais was $92.5 million. The third appraiser wrote a letter to the superior court stating that he believed that the majority's methodology failed to comply with the Agreement. He argued that the majority had determined the "fair market value" of Calais's real estate

---

[1]     303 P.3d 410, 411-14 (Alaska 2013).

[2]     AS 10.06.630(a).

holdings and not, in his view, the "fair value" of the corporation as required by the Agreement. Specifically, he objected to the majority's failure to account for any applicable capital gains taxes and liquidation costs. The superior court upheld the majority's valuation, and Calais appealed to this court.

We first determined that the terms of the Agreement authorized the superior court to review the appraisers' decision in order to ensure that the appraisers complied with the contractual terms of the Agreement.[3] We distinguished this from second-guessing the valuation reached by the appraisers, which was expressly prohibited by the Agreement.[4] We then interpreted "fair value" as used in the Agreement to mean not the "fair market value" of the company's assets (as the majority appraisers assumed), but the "liquidation value" of the company, as that term is used in AS 10.06.630(a).[5] We explained that the "liquidation value" included deductions for any applicable capital gains taxes and liquidation costs, and we reversed the superior court's decision because the majority appraisers had failed to take those taxes and costs into consideration.[6]

B.     Proceedings On Remand

On remand the superior court instructed the appraisers to calculate the fair value of Calais in accordance with our opinion and to submit a report stating that value and describing their reasoning. The panel members then completed their appraisal and issued a report. The report explained that the appraisers summed up the individual property values of Calais's real estate holdings to arrive at a "cumulative Market Value" of $87,580,000. The report then explained how the appraisers subtracted liquidation

---

[3]     *Calais*, 303 P.3d at 414-17.

[4]     *Id.* at 415.

[5]     *Id.* at 418-20.

[6]     *Id.* at 419-20.

costs and capital gains taxes and accounted for Calais's other assets and liabilities to reach a final "fair value" of $54 million.

Ivy moved the superior court to reject the panel's determination of fair value. Ivy's motion focused primarily on the fact that the appraisers had calculated the value of Calais based on a piecemeal sale of the company's assets, rather than on a sale of the entire company as a going concern. She contended that the value of Calais in a sale of the entire company as a going concern would have resulted in a much higher "fair value" for the company, and that the appraisers were therefore required to take this approach because they were required to choose the valuation method that achieved the "maximum return." Ivy also asserted various other errors in the appraisers' valuations.

The superior court rejected Ivy's arguments and accepted the appraisers' report. Ivy moved for reconsideration, largely repeating the arguments she had already made and also requesting post-judgment interest. The superior court denied reconsideration and also denied her request for interest.

Ivy now appeals, arguing that (1) the superior court improperly instructed the appraisers on remand; (2) the appraisers made substantive errors in their valuation; and (3) she is entitled to post-judgment interest.

## III. DISCUSSION

### A. The Appraisal Panel Was Properly Instructed.

In *Calais* we remanded to the superior court to remand to the appraisal panel with "explicit instructions to calculate 'fair value' as defined by AS 10.06.630(a), the other terms of the Agreement, and this opinion."[7] Ivy argues that the superior court failed to comply with this mandate. We review de novo whether the superior court

---

[7]     *Id.* at 420.

correctly applied our mandate on remand.[8]  For the reasons we are about to explain, Ivy's argument is without merit.

We remanded in *Calais* so that the superior court could correct the majority appraisers' erroneous belief that "fair value" was synonymous with "fair market value." The superior court did exactly that on remand, instructing the appraisers that " 'fair value' is not synonymous with 'fair market value' " and that "[t]he 'fair market value' of Calais's assets is just one factor to be considered in determining the 'fair value' of Calais."  The superior court's instructions also quoted AS 10.06.630(a), providing that "[t]he fair value shall be determined on the basis of the liquidation value, taking into account the possibility of sale of the entire business as a going concern in a liquidation."

Ivy, however, makes much of our requirement that the superior court issue "explicit instructions."  According to Ivy, this language meant that the superior court was required not only to instruct the appraisers to "calculate 'fair value' as defined by AS 10.06.630(a), the other terms of the Agreement, and [our] opinion [in *Calais*]," but also to provide detailed instructions on how to make this calculation, including, for example, "allow[ing] expert input from the parties regarding the precise manner in which to take into account capital gains taxes and costs of liquidation."[9]  Most notably, Ivy argues that the superior court should have instructed the appraisal panel that "[s]ince Calais is a profitable corporation, *you are required* to determine the 'fair value' of Calais on a going concern basis."  (Emphasis added.)

---

[8]      *Moeller-Prokosch v. Prokosch*, 53 P.3d 152, 154 (Alaska 2002) (quoting *Williams v. Crawford*, 47 P.3d 1077, 1079 (Alaska 2002)).

[9]      Ivy also asks us to instruct the superior court to take over the appraisal process on remand.  Because we uphold the panel's appraisal, we need not consider that request.

The detailed instructions requested by Ivy, however, would have violated the Agreement's requirement that "the appraisers . . . exercise their expertise and judgment in their determination [of the fair value of Calais] . . . without input or communication from [the parties]." Furthermore, Ivy's proposed instruction *requiring* the appraisers to calculate the fair value of Calais as a going concern would have been plainly inappropriate. As we noted in *Calais*, the Agreement specifically refers "to fair value under AS 10.06.630(a)."[10] That statute provides that "[t]he fair value shall be determined on the basis of the liquidation value, *taking into account the possibility* of sale of the entire business as a going concern in a liquidation."[11] As a California court interpreting similar language has concluded, "liquidation value" means either the "valuation of the corporation as a going concern in liquidation or the piecemeal valuation of the company's assets and liabilities as of the valuation date."[12] The Agreement did not specify which of these two valuation options the appraisers should use, and it therefore placed the task of choosing between these two options within the "expertise and judgment" of the appraisers. In other words, the Agreement required the appraisers to consider the possibility of a going concern sale, and then, if they concluded that such a sale was possible, to determine which of the two valuation options — a sale of the company as a going concern or a piecemeal valuation of the company's assets — would return a higher value. Ivy's proposed instruction would have made these determinations by judicial decree because it would have *required* the appraisers to use a going concern valuation as the basis for their "fair value" determination. That instruction was properly rejected by the superior court.

---

[10]     *Calais*, 303 P.3d at 419.

[11]     AS 10.06.630(a) (emphasis added).

[12]     *Trahan v. Trahan*, 120 Cal. Rptr. 2d 814, 822 (Cal. App. 2002).

### B.    Ivy Has Not Shown Any Error In The Appraisal.

Ivy also challenges the appraisal panel's determination of the fair value of Calais. She argues that the appraisers failed to consider a sale of Calais as a going concern, that the appraisers' report was inadequately detailed, and that the appraisers made various other errors in valuing the company's assets and liabilities. For the reasons explained below, we reject Ivy's arguments.

##### 1.    Ivy has not shown that the appraisers failed to "tak[e] into account the possibility of sale of the entire business as a going concern."

As we have already discussed, the Agreement required the appraisers to determine the "fair value" of Calais "on the basis of the liquidation value, *taking into account the possibility* of sale of the entire business as a going concern."[13] Ivy argues that the appraisers failed to even consider the possibility of a sale of Calais as a going concern, that this failure demonstrates "a lack of understanding or completion of the contractually assigned task,"[14] and that this court should therefore set aside the panel's valuation.[15]

---

[13]    AS 10.06.630(a) (emphasis added).

[14]    *Calais*, 303 P.3d at 416-17 (quoting *Farmers Auto. Ins. Ass'n v. Union Pac. Ry. Co.*, 768 N.W.2d 596, 607 (Wis. 2009)).

[15]    In this appeal, Ivy ostensibly asks us to reverse the appraisers' award because the appraisers failed to understand or comply with the terms of the Agreement. This would raise a mixed question of fact and law: it requires us to determine (1) how the appraisers reached their valuation (a factual question) and (2) whether that process shows "a lack of understanding or completion of the contractually assigned task" (a legal question). But as we are about to explain, Ivy is actually asking us to determine whether the appraisers accurately valued Calais. We review de novo whether the Agreement permits judicial review of the accuracy of the appraisers' award. *Id.* at 414.

-8-                                                                7176

Ivy's argument rests on a factual assertion: that the appraisers did not, in fact, "tak[e] into account the possibility of a sale of the entire business as a going concern" during their deliberations. But rather than support this assertion with any direct evidence of the appraisers' process, Ivy asks this court to make an inference. She argues that the appraisers were required to choose the valuation method — either a piecemeal sale of assets or a sale of the company as a going concern — that returned the highest fair value for the company. And according to Ivy, the value of Calais in a going concern sale is much more than the $54 million valuation reached by the appraisers.[16] Therefore, Ivy reasons, the appraisers must have failed to consider the possibility of a going concern sale during their deliberations.

As we explained in *Calais*, however, "[t]he court's role [under the Agreement] is not to determine whether the third party [appraisers] accurately valued the item . . . but whether the [appraisers] understood and carried out the contractually assigned task."[17] Ivy's argument ignores that distinction. She asks us to decide that the appraisers *must have* failed to "carr[y] out the contractually assigned task" *because* they reached (according to Ivy) an inaccurate valuation. To address this argument would require us to substitute our judgment for the judgment of the expert appraisers in order

---

[16]     Ivy provides a number of reasons why she believes a going concern valuation would have resulted in a higher "fair value" for Calais, including lower taxes and transaction costs, efficiency advantages, and development opportunities. Most importantly, Ivy argues that a sale of the company as a going concern would not have subjected Calais to any corporate capital gains taxes. We note that while Calais may not be required to pay capital gains taxes on its properties in a sale of the company as a going concern, the United States Tax Court has held that the existence of built-in capital gains taxes on the company's real estate holdings would reduce the price that a hypothetical willing buyer would pay for the company. *See Davis v. Comm'r*, 110 T.C. 530, 550 (1998).

[17]     *Calais*, 303 P.3d at 416 (quoting *Farmers Auto Ins.*, 768 N.W.2d at 607).

"to determine whether the third party [appraisers] accurately valued" Calais. We reaffirm our prior holding that the court's role under the Agreement is not to determine whether the appraisers accurately valued the company, but only whether they understood and completed the contractually assigned task.[18]

We are careful, however, to limit our holding by noting that although apparent inaccuracies generally do not provide a direct basis for rejecting an appraisal panel's valuation, they may entitle a party to discovery into the appraisal process. As the Wisconsin Supreme Court has noted, review of an appraisal award is "usually," but not "always," limited "to the face of the award."[19] This means that although mere "[u]nhappiness with the amount of an appraisal award is not enough to set it aside," the amount of an award may be so facially suspicious that "fraud, bad faith, material mistake, or a lack of understanding of the process are reasonably implicated."[20] In such cases, "it is within [the superior court's] discretion to allow further inquiry or discovery" into the appraisers' process.[21] We do not address whether further discovery would have been appropriate in this case because Ivy has not raised any discovery issues on appeal.

## 2.    The appraisers' report was adequately detailed.

Ivy next argues that the appraisers' report failed to comply with the

---

[18]    Though it is not necessary for our decision, we also note that letters from one of the appraisers show that the appraisers did consider the possibility of a going concern sale in the first appraisal and simply concluded that a piecemeal sale of assets would result in a higher fair value. This does not definitively prove that the appraisers considered the possibility of a going concern sale while conducting their second appraisal, but it does show that the appraisers were aware of this obligation.

[19]    *Farmers Auto Ins.*, 768 N.W.2d at 607 & n.17.

[20]    *Id.* at 607-08.

[21]    *Id.* at 608.

instructions issued by the superior court. The superior court's instructions required that the appraisers "describe the reasoning behind the conclusion as to 'fair value' " and "describe how the panel calculated the 'fair market value' of Calais's assets and the calculation and treatment of capital gains tax liabilities and other liquidation expenses." The superior court found that the appraisal panel's report complied with these instructions. Because the superior court was in the best position to determine the meaning of the instructions it issued, we review its determination that the panel complied with those instructions for abuse of discretion.[22]

We conclude that the superior court did not abuse its discretion in determining that the report issued by the appraisal panel complied with the court's instructions to "describe the reasoning behind the conclusion as to 'fair value.' " The report explained that each appraiser separately determined the fair market value of each of Calais's properties, the estimated marketing costs and capital gains tax liability, and the value of Calais's other assets and liabilities. The report then described how the appraisers combined their independent appraisals to reach a fair value of $54 million. We do not think anything else was required by the superior court's instruction to "describe the reasoning behind the conclusion as to 'fair value.' " We also note that nothing else was required by the Agreement itself, which only specified that "[u]pon completion of the appraisal process, the appraiser(s) shall be directed to prepare and deliver . . . a final report stating the appraised value of the fair value of Calais under the criteria set out in [the Agreement]."

---

[22] *Cf. del Rosario v. Clare*, 378 P.3d 380, 383-84 (Alaska 2016) (holding that this court reviews a superior court's interpretation of its own order for abuse of discretion because "the court that entered the original order is in the best position to interpret its own order").

### 3. Ivy did not preserve her other challenges to the panel's valuation.

Ivy makes a number of other challenges to the panel's valuation, but most of those arguments were either not raised at all below,[23] or else were raised only after Ivy filed her motion for reconsideration.[24] An argument is ordinarily not preserved for appeal if it was not raised below,[25] or if it was only raised after the party filed a motion for reconsideration.[26] We therefore conclude that Ivy failed to preserve a number of her arguments for appeal, and we do not address them here.

Ivy did raise one claim of error briefly below: that the appraisers erred in failing to account for Calais's tax basis in its real estate properties when they calculated the "effective tax rate." But Ivy's initial motion papers objecting to the appraisers' valuation totaled more than 50 pages, and she only raised the tax basis issue in a single cursory sentence. She included no citations to the record or to any relevant legal authority. To preserve an issue for appeal, the party must have "raised the issue below"[27]

---

[23] Specifically, Ivy's arguments that the panel was not permitted to determine the market value for each piece of property by averaging the two closest appraisals of that property; that the appraisers used a "distress" sale valuation of Calais's real properties; and that the appraisers "capitulated" to one appraiser's view on capital gains taxes.

[24] Specifically, Ivy's arguments that the appraisers valued only 39 of Calais's 41 properties and that the appraisers inaccurately calculated Calais's cash assets.

[25] *Zeman v. Lufthansa German Airlines*, 699 P.2d 1274, 1280 (Alaska 1985).

[26] *Wells v. Barile*, 358 P.3d 583, 589 n.17 (Alaska 2015) ("[A]rguments raised for the first time on reconsideration are waived."). We review de novo whether an argument was preserved. *Mitchell v. Mitchell*, 370 P.3d 1070, 1076 (Alaska 2016) (quoting *State v. Jacob*, 214 P.3d 353, 361 (Alaska 2009)).

[27] *Stadnicky v. Southpark Terrace Homeowner's Ass'n, Inc.*, 939 P.2d 403,

(continued...)

and specified her grounds for doing so.[28]  This preservation rule serves "important judicial policies:  ensuring that there is 'a ruling by the trial court that may be reviewed on appeal, . . . afford[ing] the trial court the opportunity to correct an alleged error,' and creating a sufficient factual record so 'that appellate courts do not decide issues of law in a factual vacuum.' "[29]  Here, we conclude that Ivy's single sentence, lacking any factual support or legal authority, was insufficient to preserve her argument on appeal.[30]  We need not address that argument further.

## C.  Ivy Is Entitled To Post-Judgment Interest.

Ivy's final argument on appeal is that the superior court erroneously denied

---

[27]  (...continued)
405 (Alaska 1997).

[28]  *Williams v. State*, 629 P.2d 54, 62 (Alaska 1981).  *See also* Alaska R. Civ. P. 77(b)(2) (requiring that motions include "a brief, complete written statement of the reasons in support of the motion, which shall include a memorandum of the points and authorities upon which the moving party will rely").

[29]  *Johnson v. State*, 328 P.3d 77, 82 (Alaska 2014) (alteration in original) (first quoting *Alexander v. State*, 611 P.2d 469, 478 (Alaska 1980); then quoting *Pierce v. State*, 261 P.3d 428, 433 (Alaska App. 2011)).

[30]  We acknowledge that this preservation rule is not absolute.  Rather, we may consider new arguments on appeal if they either establish plain error or (1) do not "depend on new or controverted facts"; (2) are "closely related to the appellant's arguments at trial"; and (3) could "have been gleaned from the pleadings." *Krossa v. All Alaskan Seafoods, Inc.*, 37 P.3d 411, 418-19 (Alaska 2001) (quoting *Arnett v. Baskous*, 856 P.2d 790, 791 n.1 (Alaska 1993)).  None of Ivy's unpreserved arguments establishes plain error or satisfies these three factors.  In particular, we note that Ivy's argument as to the tax basis turns on a controverted fact:  whether the appraisers did or did not take Calais's tax basis into account in determining the "fair value" of Calais.  We also doubt that the tax basis argument is "closely related" to her other arguments below, or that it could have been "gleaned from the pleadings," because Ivy admitted in her pleadings that any error in failing to account for the tax basis was "largely irrelevant" in light of her underlying argument that there should have been *no* deduction for capital gains taxes.

her post-judgment interest.[31]  Ivy received a "final judgment" in a July 6, 2010, order issued by the superior court.  We reversed that order in *Calais*.[32]  Calais concedes that Ivy would have been entitled to post-judgment interest from the July 2010 order to the date of payment if this court had affirmed the original valuation by the appraisal panel.  But Calais apparently believes that the July 2010 judgment is no longer the correct judgment from which to calculate post-judgment interest after our reversal in *Calais*.  We find Calais's argument unpersuasive, and we therefore conclude that Ivy should be awarded post-judgment interest in this case.  We do, however, agree with Calais on one important point: Ivy's post-judgment interest award should be reduced by any dividends Ivy has received on her shares in Calais since the July 2010 judgment.

### 1.    Alaska Appellate Rule 509 applies here.

Alaska Appellate Rule 509 provides the test for determining if post-judgment interest is calculated from an original judgment that is modified or reversed on appeal, or if it is instead calculated from the date of the new judgment.  Rule 509 states that "[i]f in a civil case a judgment is modified or reversed with directions that a judgment for money be issued by the trial court, interest on the new judgment . . . shall be payable from *the effective date of the prior judgment* which was modified or

---

[31]    When Ivy first raised the issue below, she asked for "interest" from "January 2010, to [the] date of final payment of her shares," but did not specify whether this was pre- or post-judgment interest.  On appeal Ivy has narrowed that request, asking only for interest from July 6, 2010, to the date of final payment, but referring to it specifically as "post-judgment interest."  We conclude that Ivy's original request for "interest" from January 2010 to the final date of payment was sufficient to preserve her argument on appeal that she is entitled to post-judgment interest from July 2010 to the final date of payment.

[32]    *Calais Co. v. Ivy*, 303 P.3d 410, 420 (Alaska 2013).

reversed."[33] Since it is clear that our result in *Calais* was a reversal, the question is simply whether our directions on remand were "directions that a judgment for money be issued by the trial court."[34]

We conclude that they were. We have previously addressed this question in two other cases. In *Brotherton v. Brotherton* we found that a remand for "a clarification of the findings with regard to [a piece of] property, and any necessary adjustments to the distribution resulting from these issues" amounted to a reversal "with directions that a judgment for money be issued by the trial court" withing the meaning of Rule 509.[35] We reached the same conclusion in *Reust v. Alaska Petroleum Contractors, Inc.*[36] when considering a remand "for reduction of . . . lost wages awards . . . , for application of the punitive damages cap . . . , and for review of the recalculated punitive damages award for excessiveness."[37]

Notably, we concluded that our remands in *Brotherton* and *Reust* fell within the scope of Rule 509 even though they required the superior court to conduct further fact finding or legal analysis. In *Brotherton* the superior court on remand was required

---

[33]     Alaska R. App. P. 509 (emphasis added).

[34]     We review a superior court's interpretation of the Alaska Appellate Rules de novo. *Shea v. State, Dep't of Admin., Div. of Ret. & Benefits*, 204 P.3d 1023, 1026 (Alaska 2009).

[35]     *Brotherton v. Brotherton* (*Brotherton II*), 142 P.3d 1187, 1192 (Alaska 2006) (quoting *Brotherton v. Brotherton* (*Brotherton I*), 941 P.2d 1241, 1248 (Alaska 1997)).

[36]     *Reust v. Alaska Petroleum Contractors, Inc.* (*Reust II*), 206 P.3d 437, 441 (Alaska 2009) (applying Rule 509 to remand in *Reust v. Alaska Petroleum Contractors, Inc.* (*Reust I*), 127 P.3d 807 (Alaska 2005)).

[37]     *Reust I*, 127 P.3d at 826.

to make new factual findings as to whether a piece of property was marital or premarital property.[38] In *Reust* the superior court was required to examine whether the new punitive damages award was "excessive."[39]

In this case, we reversed the superior court's final order and remanded "to the superior court to remand to the panel with instructions to calculate the fair value of Calais as defined by AS 10.06.630(a), other terms of the Agreement, and this opinion."[40] We acknowledge it was the appraisers, and not the superior court, who conducted additional fact-finding and analysis on remand, but we see no substantive distinction, at least for the sake of determining the application of Rule 509, between a remand for further fact-finding by the superior court and a remand for a new valuation by an appraisal panel. Because we conclude that our remand in *Calais* constituted a reversal with "directions that a judgment for money be issued by the trial court" under Rule 509, we also conclude that Ivy is entitled to post-judgment interest on the July 2010 order.

>    **2.    Awarding Ivy post-judgment interest does not do an injustice to Calais, but the award should be lowered by the amount of dividends Ivy has received on her Calais shares since her final judgment.**

In addition to arguing that Appellate Rule 509 does not apply to this case, Calais argues that Ivy should be denied post-judgment interest on three alternative grounds. We will deny post-judgment interest "only when such an award would do an injustice."[41] For the reasons we are about to explain, we find Calais's first two arguments unpersuasive, but we agree with Calais that the dividends Ivy has received on

---

[38]    *Brotherton II*, 142 P.3d at 1188.

[39]    *Reust II*, 206 P.3d at 438.

[40]    *Calais Co. v. Ivy*, 303 P.3d 410, 420 (Alaska 2013).

[41]    *Farnsworth v. Steiner*, 638 P.2d 181, 184-85 (Alaska 1981).

her shares in Calais since her final judgment should be subtracted from her post-judgment interest award.

Calais's first argument is that Ivy is not entitled to any interest because she was not entitled to receive any money until the panel returned an appraisal that complied with the Agreement. At first glance, this argument appears compelling. As we have previously stated, "[t]he real question in awarding interest . . . is whether the debtor has had use of money for a period of time when the creditor was actually entitled to it."[42] Under the Agreement Calais was only required to pay Ivy for her shares "following receipt of the appraisal report described in Paragraph 5." Paragraph 5 of the Agreement required the appraisers "to determine the fair value of Calais in accordance with this Settlement Agreement and AS 10.06.630(a)." As we explained in *Calais*, the first appraisal by the panel *did not* determine the "fair value" of Calais in accordance with AS 10.06.630(a), because it did not account for capital gains taxes and liquidation costs.[43] Calais can thus reasonably assert that Ivy was not entitled to any money until the date of the second appraisal (October 31, 2014), because the appraisers did not return an appraisal "described in Paragraph 5" of the Agreement until that time.

But "[w]e interpret settlement agreements as contracts,"[44] and "[t]he objective of contract interpretation is to determine and enforce the reasonable expectations of the parties."[45] The expectation of the parties was that Ivy would be paid

---

[42]    *Id.* at 184.

[43]    *Calais*, 303 P.3d at 420.

[44]    *Id.* at 414 (citing *Chilkoot Lumber Co. v. Rainbow Glacier Seafoods, Inc.*, 252 P.3d 1011, 1014 (Alaska 2011)).

[45]    *Id.* at 418 (quoting *Norville v. Carr-Gottstein Foods Co.*, 84 P.3d 996, 1004 (Alaska 2004)).

well within a year of the superior court's approval of the Agreement. The Agreement provided that the three appraisers would be selected or appointed within 45 days of the execution of the Agreement. The appraisers were then to appraise the fair value of Calais "as promptly as is practicable," and the parties agreed "not to nominate any appraiser who cannot commit to complete the work required by this Agreement within [120] days following their appointment or selection." Calais was then required to pay Ivy within 60 days of receiving the panel's report. In total, the parties expected that Calais would pay Ivy within 225 days of the execution of the Agreement — i.e. by January 7, 2010. The parties did not expect six more years of litigation to resolve this dispute. Given these facts, we cannot say that awarding Ivy post-judgment interest beginning in July 2010 would do an injustice.

Calais next argues that Ivy is not entitled to post-judgment interest because Calais's delay in payment was Ivy's fault — specifically, because Ivy has refused to sign a letter authorizing the sale of Ivy's shares while this appeal has been pending. But Alaska "view[s] interest on damage awards to be a form of compensation for the period that the plaintiff remains 'less than whole,' " and we therefore "do not consider responsibility for a delay of payment as a factor in making an interest award."[46] As we have explained, "[f]or us to rule otherwise would amount to awarding [the appellee debtor] the free use of [the appellant creditor's] money and also impose a 'chilling effect' upon a judgment creditor's right to appeal an award he feels is not entirely adequate."[47]

Finally, Calais argues that an award of interest would be unfair because Ivy has received dividends from her shares in Calais throughout this litigation. According to an affidavit filed by Calais's counsel, Ivy has received dividends totaling $447,500

---

[46]     *Farnsworth*, 638 P.2d at 185.

[47]     *Id*.

since she placed her shares in escrow. (This affidavit appears to be the only evidence of such payments, but Ivy has not disputed this fact on appeal.) If Ivy has, in fact, received any dividends since her July 2010 final judgment, we agree that it would be unfair for her to also receive the full amount of post-judgment interest. The purpose of interest is "compensation for the period that the plaintiff remains 'less than whole.' "[48] Making Ivy whole means contemplating the position she would be in if Calais had purchased her shares in July 2010. But if Calais had purchased Ivy's shares in July 2010, Ivy would have stopped receiving dividends. Thus, making Ivy whole only requires awarding her the difference between the post-judgment interest and the dividends she has actually received since July 2010.

## IV. CONCLUSION

For the reasons explained above, we AFFIRM the superior court's enforcement of the settlement agreement but REVERSE the superior court's denial of post-judgment interest. We REMAND for calculation of post-judgment interest minus the dividends Ivy has received.

---

[48]     *Id.*