NOTICE

*Memorandum decisions of this court do not create legal precedent. A party wishing to cite such a decision in a brief or at oral argument should review Alaska Appellate Rule 214(d).*

THE SUPREME COURT OF THE STATE OF ALASKA

| | | |
|---|---|---|
| MEGAN ARMSTRONG, | ) | |
| | ) | Supreme Court No. S-16864 |
| Appellant, | ) | |
| | ) | Superior Court No. 3DI-15-00113 CI |
| v. | ) | |
| | ) | MEMORANDUM OPINION |
| FRANK WOODS III, | ) | AND JUDGMENT* |
| | ) | |
| Appellee. | ) | No. 1727 – June 26, 2019 |
| | ) | |

Appeal from the Superior Court of the State of Alaska, Third Judicial District, Dillingham, Kari Kristiansen, Judge.

Appearances: Dan Allan, Law Offices of Dan Allan & Associates, Anchorage, for Appellant. Michael J. Walsh, Law Office of Michael J. Walsh, Scottsdale, Arizona, for Appellee.

Before: Bolger, Chief Justice, Winfree, Stowers, and Maassen, Justices. [Carney, Justice, not participating.]

# I. INTRODUCTION

A man and woman cohabited as domestic partners. Upon the domestic partnership's formal dissolution, the superior court awarded the man primary physical custody of the couple's children and equally distributed what the court determined was partnership property. The woman appeals the factual basis of the court's custody award,

---

\* Entered under Alaska Appellate Rule 214.

the court's classification of certain property as separate, and the court's allocation of certain partnership property.

We affirm the superior court's custody decision. We also affirm the court's classification of the commercial fishing permit as separate property. But we remand for the superior court to determine whether other property should be reclassified and to adjust its distribution if needed.

## II.    FACTS AND PROCEEDINGS

### A.    Facts

Megan Armstrong and Frank Woods III began a domestic partnership[1] in 2002 and had six children over the following decade. The family resided in Dillingham, in a house Woods purchased in 2007 and refinanced in March 2015.

Woods is employed by Bristol Bay Native Association (BBNA) and fishes commercially for salmon and herring. Woods obtained a commercial fishing permit in 1988. Armstrong crewed on Woods's fishing boat for two to three weeks in 2002, shortly before their domestic partnership began, and she held a leased fishing permit for that season; she did not thereafter work on Woods's fishing ventures. In 2010 — during the domestic partnership — Woods purchased the fishing boat F/V WAVE RYDER.

In 2015 Woods formed Paradise Logistics, LLC with partners to purchase the tender boat F/V KULUKAK QUEEN for the upcoming summer 2015 fishing season. Woods testified at trial that he purchased an ownership share in the tender business for $10,000 and spent an additional $15,000 to $20,000 on the business in 2015. He testified that he borrowed this money, although the lender is unclear from the record. Woods denied that the money came from the 2015 home refinancing. Armstrong had

---

[1]    Under Alaska's property division law, a domestic partnership arises when "unmarried cohabitants liv[e] in a marriage-like relationship." *Tomal v. Anderson*, 426 P.3d 915, 922 n.4 (Alaska 2018).

attended two meetings when Woods and his partners discussed forming Paradise Logistics, but, according to the one partner's testimony, Armstrong advised Woods that his efforts would be better directed toward obtaining another fishing permit.

Woods replaced the F/V KULUKAK QUEEN's motors with motors from the F/V WAVE RYDER before the start of the 2015 fishing season. He then obtained motors for the F/V WAVE RYDER, but installation issues prevented readiness for the 2015 fishing season and drove up the cost. Because the F/V WAVE RYDER would not be ready, one of Woods's Paradise Logistics partners loaned him $60,000 to purchase another fishing boat, the F/V CAPTAIN CADE. In March 2016 Woods obtained a loan from the Alaska Commercial Fishing and Agricultural Bank (CFAB) to finance the F/V WAVE RYDER's motor replacements, along with other upgrades, and to repay the loan used to purchase the F/V CAPTAIN CADE. The CFAB loan was secured by Woods's commercial fishing permit, the F/V WAVE RYDER, and the F/V CAPTAIN CADE.

Prior to his relationship with Armstrong, Woods struggled with substance abuse and anger management. He had been physically and emotionally abusive toward partners and children in previous relationships. But he testified that he had learned to control his anger through counseling, had been sober for 28 years, and regularly had attended Alcoholics Anonymous meetings. Armstrong does not allege that Woods continued to have substance abuse issues or that he abused her or their children.

Armstrong struggled with anger management during her relationship with Woods. Woods testified that in 2003 Armstrong choked one of his daughters from a previous relationship and that in 2010 she was jailed for knocking headphones off his head. In 2012 BBNA obtained a restraining order after Armstrong repeatedly demanded to see Woods's emails with female colleagues, appeared at BBNA's office, and was detained by police. Armstrong subsequently appeared at BBNA's office with the couple's children, accused Woods of not caring for them, and demanded that he watch

them while he was at work. Woods and a friend testified that Armstrong also brought the children to at least two of Woods's Alcoholics Anonymous meetings, accusing attendees of Satan worship. Armstrong does not deny these incidents occurred.

It is unclear when Woods intended to separate permanently from Armstrong. He moved out of the couple's home for the last time in January 2016 but was living on the F/V KULUKAK QUEEN in fall 2015. Woods testified that he later moved back into the home to attempt a reconciliation. He also testified that he returned only for the holidays but that he intended to end the relationship as early as February 2015.

## B.    Proceedings

Woods filed his operative complaint in June 2016, seeking shared custody of the children, dissolution of their domestic partnership, and distribution of partnership property. A trial was held between April and August 2017.

Woods and Armstrong disputed the length of his absences for fishing and her ability to meet their children's educational needs. Armstrong testified that Woods was absent for six months a year. Woods testified that he spends about 50 days a year fishing, during which he is away from his children. He also testified that he occasionally travels for BBNA work, but that such travel is limited to stretches of four or five days.

Woods and Armstrong also disputed Armstrong's ability to provide for the care and educational needs of their children. Armstrong's aunt testified that Armstrong had "primary physical custody [of the children] for their whole lives." Meanwhile Woods claimed that Armstrong is incapable of regularly getting the children to school on time and that they often are absent when he is unavailable to transport them. Woods testified that a child missed 14 days of school one May while he was away fishing; attendance records admitted at trial indicate that two children had 14 unexcused absences in May 2013. He also testified that he took the children to school even after the couple separated, although four of the children were living with Armstrong at the time of trial.

In February 2015 their 11-year-old son fell behind on English assignments at school, apparently due to absences while Woods was away on travel, and was suspended from the basketball team. Armstrong withdrew the son for the remainder of the school year. Woods objected to the withdrawal, arguing that Armstrong provided no home instruction. Armstrong offered several reasons for the withdrawal, including dissatisfaction with the administration and concern about her son's ability to handle schoolwork and extracurricular activities, but she conceded that she did not provide any instruction during the withdrawal period.

Woods and Armstrong also disputed whether Armstrong struggles with her mental health. Woods testified that in 2011 Armstrong began telling him the devil was communicating with her and knew her personal information. An acquaintance called as a witness by Woods testified that in 2016 she saw Armstrong in a hospital hallway — apparently with one of her daughters — "curled up in a ball" on the floor and unresponsive. Armstrong refuted this characterization.

The superior court awarded Woods sole legal and primary physical custody of the six children, dissolved the domestic partnership, and identified and ordered distribution of partnership property. The court found Woods was "capable of meeting the children's physical, emotional, social and educational needs." It acknowledged Woods's past problems with anger and domestic violence, but credited him with 28 years of sobriety. It also credited him with ensuring that the children attended classes and extracurricular activities. By contrast, the court found Armstrong was "not capable of meeting the children's emotional[,] . . . . educational[,] and social needs." The court cited incidents when Armstrong behaved inappropriately while in charge of the children, including when she was seen curled in a ball and unresponsive in a hospital hallway and when she brought the children to confront Woods at his workplace and Alcoholics Anonymous meetings. The court commented, "At various times, [Armstrong] appears

to struggle meeting her own mental health needs." Regarding the children's educational and social needs, the court highlighted Armstrong's removal of the couple's 11-year-old son from school for several months in 2015, harming his academic progress, and the 14 days of school absences that occurred while Woods was away fishing.

The superior court found that Woods and Armstrong had formed an implicit agreement to share property acquired during their domestic partnership. The court determined that the two fishing boats — the F/V WAVE RYDER and F/V CAPTAIN CADE — were domestic partnership property, stating that "[t]he fishing vessels and equipment purchased prior to 2015 are indeed domestic partnership property subject to division by this court." But the court determined that Woods's 1988 fishing permit and his 2015 investment in Paradise Logistics were his separate property. The court stated that "[t]here is no evidence that the parties intended to treat [Paradise Logistics] as domestic partnership property." The court also noted that Woods invested in the business during a separation from Armstrong and that the business had failed to generate significant profit. The court classified the home and all existing debt — including the 2016 CFAB loan and the 2015 home refinancing loan — as partnership property.

The superior court awarded the F/V WAVE RYDER and fishing equipment to Woods; it awarded the F/V CAPTAIN CADE and an older boat to Armstrong. The court assigned all debt to Woods; it apparently did not require Woods to remove CFAB's security interest in the F/V WAVE RYDER or F/V CAPTAIN CADE. The court ordered Woods to make a small equalization payment to Armstrong, resulting in an equal distribution of partnership property.

Armstrong appeals the superior court's custody ruling, its classification of Woods's fishing permit and his investment in Paradise Logistics as his separate property, and its allocation of partnership property.

## III.  STANDARD OF REVIEW

"The trial court has broad discretion in child custody decisions.  A trial court's determination of custody will be set aside only if the entire record demonstrates that the controlling findings of fact are clearly erroneous or that the trial court abused its discretion."[2]  "Abuse of discretion is established if the trial court considered improper factors in making its custody determination, failed to consider statutorily mandated factors, or assigned disproportionate weight to particular factors while ignoring others."[3] "Factual findings are clearly erroneous if a review of the record leaves us 'with the definite and firm conviction that the superior court has made a mistake.' "[4]

"[A]bsent a controlling statute or a valid contract between the parties, [partnership] property must be classified strictly according to the parties' intent."[5]  "The trial court's underlying findings as to the parties' intent are factual findings reviewed for clear error.  The trial court's classification decisions based on statute, contract, or intent are applications of law to fact reviewed de novo."[6]  "[W]e will review the trial court's allocation decisions, and its decision to order an equalization payment, for abuse of discretion."[7]

---

[2]    *Hamilton v. Hamilton*, 42 P.3d 1107, 1111 (Alaska 2002) (footnote omitted).

[3]    *Id.*

[4]    *Collier v. Harris*, 377 P.3d 15, 20 (Alaska 2016) (quoting *William P. v. Taunya P.*, 258 P.3d 812, 814 (Alaska 2011)).

[5]    *Tomal*, 426 P.3d at 923.

[6]    *Id.* (footnotes omitted).

[7]    *Id.* at 924.

## IV. DISCUSSION

### A. The Superior Court Did Not Abuse Its Discretion By Awarding Woods Primary Physical Custody Of The Children.

Armstrong argues that the superior court abused its discretion by awarding Woods primary physical custody of the children. First, she claims that the court overlooked her role as "primary caretaker" and Woods's absences for travel and fishing. She suggests that the court overly relied on Woods's daily transportation of the children to school as evidence he was better able to provide for their emotional, educational, and social needs and their best interests would be better served by awarding him primary custody. Second, Armstrong claims that the court gave too much weight to incidents in her past while crediting Woods for overcoming his addiction and anger issues. Finally, Armstrong claims that the court found, without evidence, that she struggled with mental health and therefore was unable to provide for the children's emotional needs.

The superior court did not ignore Armstrong's role as primary caretaker. It stated that "Armstrong primarily cared for the couple's six children when they were small." And the court expressly considered her performance as caretaker, pointing to her withdrawal of one son from school and the children's absences when Woods was away, when it found that she was unable to provide for their educational or social needs. Contrary to Armstrong's argument, the court did take her parental role into account when making its custody decision.

Armstrong also is incorrect that the court overlooked Woods's absences for travel and fishing. The court noted that Woods often is away during fishing season and sometimes travels for work. Armstrong seems to believe that the court understated the length of these absences, which she asserts last as long as six months a year. But this assertion is not supported by any testimony other than her own. Woods testified that he is gone about 50 days a year during fishing season and that he occasionally travels for

work, but for only four or five days at a time. This testimony supports the court's finding, made after considering all the relevant evidence.

Armstrong also is incorrect that the court lacked evidence to find she struggled with her own mental health needs and could not provide for the children's emotional needs. The court cited testimony that Armstrong was found unresponsive with one of the children in a hospital hallway and that she publicly confronted Woods on several occasions, including that she called Alcoholics Anonymous "Satanic" in front of the children. The court's finding is neither clearly erroneous, nor necessarily a controlling finding — we note that the court also found that Armstrong was not capable of providing for the children's educational or social needs.

Finally, Armstrong also is incorrect that, when determining which parent was more capable of meeting the children's emotional, educational, and social needs, the superior court gave too much weight to incidents in her past while downplaying similar incidents in Woods's past. The court found that Woods had been sober for 28 years and had not acted violently during his relationship with Armstrong. It found that Armstrong's more recent assaults and public confrontations with Woods spanned their relationship. Their comparative conduct and its timing were relevant, and the court did not clearly err by finding in Woods's favor on this best interests factor.

We therefore conclude, based on its findings, that the superior court did not abuse its discretion by awarding Woods primary physical custody of the children.

**B.  Armstrong Waived Her Argument That The Superior Court Clearly Erred By Finding That Woods's Fishing Permit Was His Separate Property.**

Armstrong argues that the superior court erred by finding Woods's fishing permit was his separate property. She argues that the fishing permit — obtained by Woods in 1988, 14 years before the domestic partnership began — became partnership

property through transmutation and because Woods used the permit, along with partnership property, to secure the domestic partnership CFAB loan.

Transmutation occurs when separate property, including property acquired before marriage, is converted into marital property.[8] We have not yet considered whether transmutation is applicable to domestic partnership property. But Armstrong did not argue to the superior court that the fishing permit was transmuted until she sought reconsideration of the court's amended order dissolving the partnership and distributing the partnership property. Armstrong therefore waived the argument that the permit was transmuted.[9]

### C. The Superior Court May Have Erred By Classifying Some Or All Of Woods's Ownership Share In Paradise Logistics As His Separate Property.

Armstrong argues that Woods's ownership share in Paradise Logistics was partnership property for two reasons. First, because she attended two meetings when Woods and his business partners discussed the venture. Second, because domestic partnership property — motors from the F/V WAVE RYDER — and proceeds from Woods's 2015 home refinancing and 2016 CFAB consolidation loan, both of which the superior court classified as partnership property, were used to fund and equip Paradise

---

[8] *Kessler v. Kessler*, 411 P.3d 616, 618-19 (Alaska 2018). "One way [transmutation] can take place is by an implied interspousal gift. This occurs when one spouse intends to donate separate property to the marital estate and engages in conduct demonstrating that intent." *Id.* at 619. *Kessler* described the required intent for transmutation by implied interspousal gift as follows: "[T]he intent that must be shown is the intent of the owning spouse that his or her separate property be treated as marital property *for the purpose of dividing property in the event of a divorce*." *Id.* (emphasis in original).

[9] *Ivy v. Calais Co.*, 397 P.3d 267, 275 (Alaska 2017) ("An argument is ordinarily not preserved for appeal if it was not raised below, or if it was only raised after the party filed a motion for reconsideration." (footnote omitted)).

Logistics.

Armstrong's participation in discussions about forming the business does not establish that Woods and Armstrong intended to share Woods's ownership share in Paradise Logistics. One of Woods's business partners testified that Armstrong's participation was limited to advising Woods to invest instead in another fishing permit. We also note that the superior court distinguished Woods's involvement in Paradise Logistics from his other fishing ventures, which the court found he intended to share as partnership property, because Paradise Logistics was formed during a separation period. Although it is unclear when Woods intended to end the domestic partnership, Armstrong does not contest this point; we therefore cannot conclude that the superior court's findings regarding the separation timing or Woods's intent were clearly erroneous.

But we conclude that Woods's ownership share in Paradise Logistics may have been partnership property, in whole or part, because — as Armstrong argues — Woods appears to have obtained it using partnership equipment and loan proceeds. In the divorce context, we apply the doctrine of "tracing" to determine the character of property if it cannot readily be classified as marital or separate.[10] We call such property a secondary asset, and we use tracing to identify the source from which it derived.[11] Source property is called a primary asset.[12] Secondary assets derived from marital primary assets are classified as marital, and secondary assets derived from separate

---

[10] *Schmitz v. Schmitz*, 88 P.3d 1116, 1127-28 (Alaska 2004). Marital property is property acquired during marriage "as compensation for marital services"; separate property is property acquired prior to marriage or during marriage by gift or inheritance. *Id*. at 1127 (quoting BRETT R. TURNER, EQUITABLE DISTRIBUTION OF PROPERTY § 5.23, at 263 (2d ed. 1994)).

[11] *Id*.

[12] *Id*.

primary assets are classified as separate.[13] A secondary asset may be classified as both marital and separate in proportion to the amount of marital and separate primary assets used to acquire it, if that proportion can be determined.[14] We note that, unlike transmutation, intent does not determine the character of traceable property.[15]

Although we have not had occasion to decide whether to apply the tracing doctrine to domestic partnerships, doing so is logical. Armstrong argues that because Woods's share of Paradise Logistics was obtained with domestic partnership assets, it therefore is a domestic partnership asset. This is a tracing argument. Woods does not address Armstrong's argument at all, and he therefore does not contend that tracing is inappropriate in the domestic partnership context.

Woods testified that he spent $10,000 for his share in Paradise Logistics and that he spent an additional $15,000 to $20,000 on the business in 2015. He denied that this money came from his 2015 home refinancing. But the superior court stated in its findings that "[i]n March of 2015, Woods refinanced the couple's home and received $47,000 that was utilized to expand and improve the fishing business. Woods also took out a CFAB loan in the amount of $224,000 to cover all of his fishing ventures." The court classified both loans as partnership property. The court also found the F/V WAVE RYDER was partnership property, and therefore its motors presumably were partnership

---

[13]     *Id.* at 1128.

[14]     *Id.*

[15]     *See id.* (stating character of primary asset determines character of secondary asset to which it is traced); *Kessler v. Kessler*, 411 P.3d 616, 618-19 (Alaska 2018) (transmutation "occurs when one spouse intends to donate separate property to the marital estate"); *Carlson v. Carlson*, 722 P.2d 222, 224 (Alaska 1986) ("[P]arties may, by their actions during marriage, demonstrate intent to treat specific properties as joint holdings even though they were acquired by one spouse prior to marriage.").

property as well. Had Woods used his separate property to replace the motors taken from the F/V WAVE RYDER, there may have been no effective use of partnership property to fund his LLC interest. But the record reflects that Woods used the CFAB loan, classified as partnership debt by the court, to replace the motors (and upgrade the F/V WAVE RYDER).

Any error by the superior court in classifying Paradise Logistics as Woods's separate property might have been harmless if, as the superior court stated, the "venture has made a minimal profit, if any," and the investment had no value at the time of trial.[16] The court explained that a profit and loss statement for Paradise Logistics incorrectly showed a net income of $91,454, because it failed to account for "start up costs of $80,000 . . . as well as more investment made by Woods's business partner . . . in 2016." But the record does not support finding that there were $80,000 in "start up costs." Woods testified that he and the two other partners invested $80,000 in the business, but a significant portion of this amount appears to be the partners' equity investment. Armstrong and one partner testified that Woods purchased a 40% stake in the business. The partner also testified that the profit and loss statement did not reflect $60,000 in loans, including a $30,000 personal loan he made in 2016. Woods similarly testified that there were $60,000 in start up costs — not $80,000. This testimony suggests that Paradise Logistics had at least a net value of about $30,000, in which case any error in classifying Woods's ownership share in Paradise Logistics as partnership property would not be harmless.

We cannot determine from the record whether, as Armstrong argues, partnership equipment and loan proceeds were the source of Woods's investment in

---

[16]     *See Ogard v. Ogard*, 808 P.2d 815, 819 (Alaska 1991) ("Ordinarily . . . the date of valuation . . . should be as close as practicable to the date of trial.").

Paradise Logistics; tracing Woods's ownership share in Paradise Logistics to the partnership motors and loans might entail that his share also was partnership property. We remand to the superior court to give full consideration to the issue. The court must clarify whether Woods used partnership loan proceeds to purchase his ownership share in Paradise Logistics. If the court finds that this did occur, it must decide whether tracing requires reclassifying Woods's interest in Paradise Logistics and adjusting the distribution of partnership property accordingly.

D. **The Superior Court Did Not Abuse Its Discretion By Awarding Woods Income-Generating Property, As Well As The House And Retirement Account.**

Armstrong argues that the superior court erred by awarding all income-generating property to Woods — including boats and fishing equipment — as well as the house and his retirement account. Assuming that all the fishing property is income-generating, it is not true that Woods received all the income-generating property. The court awarded Armstrong the F/V CAPTAIN CADE and an older boat.[17] Moreover, the court had reason to award most of the fishing property to Woods: He used it for commercial fishing, while Armstrong's work on a fishing boat apparently was brief and ended some 14 years before the partnership's dissolution. The superior court stated that it was awarding the house to Woods because it was awarding him primary physical custody of the children. Finally, it should be noted that the court equally distributed the value of what it classified as partnership property. Nothing indicates that the superior court abused its discretion in its specific property allocation.

---

[17] We note that the superior court apparently did not require Woods to remove CFAB's security interest in the F/V WAVE RYDER or F/V CAPTAIN CADE. The superior court should consider the issue on remand.

## V. CONCLUSION

The superior court's custody decision and its classification of Woods's commercial fishing permit as his separate property are AFFIRMED. We REMAND for the superior court to determine whether Woods used domestic partnership property to purchase his separate business interest, and to adjust its property distribution if needed.

We do not retain jurisdiction.