KREBS et al.
v.
McDONALD'S EX'X et al.

Court of Appeals of Kentucky.
Dec. 18, 1953.

James W. Stites, and Stites, Wood, Helm & Taylor, Louisville, for appellants.

Oldham Clarke, Allen, McElwain, Dinning & Clarke, Louisville, for Nora Belle McDonald, etc.

Gilbert Burnett, Louisville, for Helen W. Burnett et al.

MILLIKEN, Justice.

This litigation involves the validity and interpretation of a stockholders' agreement which was intended to assure surviving stockholders in the Southern Optical Company, a closely held corporation, the right to purchase the stock of a deceased stockholder at a reasonable price for a reasonable time after his death. The appellants are surviving stockholders who seek by an action in equity to compel the sale to them of the stock of Clarence B. McDonald, who died testate in December, 1947. Dividends were paid to his widow, his executrix, until June 14, 1948, when they were stopped.

After several oral efforts to buy the stock, the appellants offered by letter of March 10, 1949, to purchase the stock for $100 a share, which they claim was the price set upon it in compliance with the shareholders' agreement. Mrs. Nora Belle McDonald, executrix and sole heir of her husband's estate, did not accept the offer, but on May 3, 1949, in a letter to the appellant Mr. Krebs, expressed a willingness to sell her stock at $175 a share providing certain retained dividends were paid her. The State Department of Revenue had placed that value upon it for inheritance tax purposes after reaching a valuation of $218 a share pursuant to the usual formula used by it.

The stockholders' agreement came into being as a result of the benevolence of Carl M. Wiseman, founder and sole owner of the Southern Optical Company. Mr. Wiseman died in 1926, bequeathing one-fourth of his stock in the Company to his sister, Helen Wiseman Burnett, and the remainder in specified amounts to designated employees of the Southern Optical Company, including the appellants. Charles C. Krebs and H. Lyle Duerson, and to the decedent, Clarence B. McDonald, whose shares are the subject of this litigation. The appellant Mr. Sanning obtained his stock from the others on the basis of similar valuations. In order to perpetuate the memory of their benefactor, Mr. Wiseman, and to assure the continuance of the Company on a basis of harmonious ownership and profit, all of the shareholders signed an agreement at Louisville on January 28, 1927, the pertinent part of which states:

"Now, in order that this plan may be carried into effect, and in consideration of the mutual agreements herein contained, each with the other, we severally agree and undertake that in the

event either of us shall at any time quit his or her active connection with the Southern Optical Company, voluntarily or involuntarily, or in the event of our death (in which event this agreement shall be binding on our heirs, personal representatives, and assigns) or in the event any of us desire to sell, assign, or transfer any share of the said capital stock or in the event any stock belonging to either of us shall be taken or surrendered by bankruptcy or any Court process, then in any of the said events, the remaining stockholders shall have the option and right to purchase the same *for a reasonable time at a reasonable price, to be fixed by the stockholders at a special annual meeting to be held on the first Monday in February of each year hereafter at which meeting the last regular annual audit figures shall be used as the primary basis of valuation of the stock, and the price so fixed and determined by the stockholders to be in effect for a period of one year following the said meeting* and until the meeting in February, 1928, the value of the stock shall be taken as the book value determined by the annual audit of Mason and Parker for the past year, the said remaining stockholders to be given a reasonable opportunity to purchase any such stock at the said price so fixed and in a quantity in proportion to the number of shares held by said remaining stockholders." (Emphasis ours.)

Acting under this agreement, special annual shareholders' meetings were held each year after the auditors' report for the preceding year was available, and an agreed valuation was placed on the stock for the current year. On four separate occasions during the intervening twenty years Mr. McDonald and the other eligible shareholders acquired, at the prices thus set, their proportionate share of the stock of deceased shareholders or those who withdrew from the Company. Mr. McDonald acquired 152¼ of his 252¼ shares in this way, the other 100 shares representing the be-

quest to him in the will of Mr. Wiseman. The McDonald shares were covered by five stock certificates, four of which had written across them in ink, "Subject to Stockholders' Agreement." They were found in Mr. McDonald's safety deposit box when it was opened on December 29, 1947, in the presence of Mrs. McDonald, her counsel, Mr. Franz, Miss Mildred Franz, and a representative of the State Department of Revenue.

Mr. McDonald was a signer of this agreement and one of the architects of the method of evaluating the stock here involved. Throughout the years the valuations thus established did not sensitively reflect the fluctuations in real or actual value, but appeared to be approximations accepted by all concerned as the proper values for the purposes of the agreement. In other words, the affected shareholders considered the values thus set to be reasonable. We do not know all of the factors they considered, but certainly one of them was the size and nature of the corporation itself. The shareholders in closely held corporations bear a personal relationship to one another similar to that of a partnership and, as a consequence, the shares in such corporations signify more than a mere property interest. The restrictive stock agreement is one of the devices evolved for assuring the succession in interest of persons most likely to act harmoniously with the other shareholders. 18 C.J.S., Corporations, § 391; Fletcher, Private Corporations, Sections 5456, 5457; 37 Va.L.R. 229. In order to induce desired individuals into investing their capital in such closely held corporations with the stock restrictions often imposed, the price must be attractive as well as the prospects of future earnings. In a service corporation such as the Southern Optical Company, the maintenance of a harmonious personnel, as well as a skilled one, is admittedly essential to the success of the business. While a precise method of evaluating the stock might be desirable from our standpoint, such restrictive agreements often allow a lot of leeway. 65 H.L.R. 773. In the case at bar, the criteria for evaluating the stock are so broad in

their implications that we conclude they amounted to a carte blanche grant of power to the shareholders to set the valuation at whatever they considered reasonable so long as they acted in good faith. While it is true Mr. McDonald did not receive written notice of the 1947 meeting at which the valuations were set, he knew of the meeting and could not have attended even had he received such a notice. He did attend and participate in the 1946 meeting setting the value at $100 a share, which valuation was extended for another year at the 1947 meeting despite an increase in actual value during the year. As heretofore stated, the valuations under the agreement never sensitively reflected changes in actual value throughout the prior twenty years of its operation, and Mr. McDonald was one of the architects of this method. His widow, as executrix and sole successor in interest, cannot now be heard to complain about this method of valuation. As stated in New England Trust Co. v. Abbott, 162 Mass. 148, 38 N.E. 432, 434, 27 L.R.A. 271:

> "There is no evidence that the testator ever objected to this mode of dealing with it; and we see no good reason why the plaintiff should be obliged to accept damages for which it might be difficult to lay down a clear rule, instead of performance. * * * The case would perhaps stand differently if the shares were bought and sold in the market like most stocks. * * * The defendant does not charge the directors with any fraud in the appraisal. He expressly disclaims that. It is well settled that where one agrees that another may fix the price for certain property, or the sum to be paid for material or services, the decision of the party selected cannot be impeached by showing that he has committed an error of judgment, or failed to avail himself of all the information which he might have obtained, or has valued the property too high or too low. * * * The evidence that was offered by the defendant relating to the value of the stock was therefore rightly excluded. It is equally well settled that specific performance of an agreement to convey will not be refused merely because the price is inadequate or excessive. The difference must be so great as to lead to a reasonable conclusion of fraud, mistake, or concealment in the nature of fraud, and to render it plainly inequitable and against conscience that the contract should be enforced."

In view of all the circumstances in the case at bar, we do not find that enforcement of the agreement at the valuation so established would be inequitable and against conscience.

■ There is much discussion in the briefs of counsel as to when, if at all, an offer was made by the appellants to purchase the stock until they made the offer in writing of March 10, 1949. They say they did offer through and to her counsel who also was counsel for the Company, and that notice to him was notice to her so far as they were concerned. Because of Mrs. McDonald's age, crippled condition and sorrow all communications for her were sieved through her friends, the Franzes, with whom she lived. It is obvious to us that the appellants tried to exercise the option, that they were attempting to do so as decorously as possible in the light of the circumstances, and that they finally sought to bring the matter to a head in June, 1948, by stopping the payment of dividends on the McDonald stock. We cannot determine the exact time the oral offers to purchase were made or transmitted, but it is clear that the cessation of dividend payments, together with their other efforts, was notice enough that the appellants wanted the stock at the established valuation. The difficulty of reaching Mrs. McDonald personally cannot be permitted to limit the appellants in their rights under the agreement. Believing that the appellants made every reasonable effort to indicate their desire to exercise their option to purchase the stock during the six or seven months immediately following Mr. McDonald's death, we conclude that the date the dividends were stopped is the most practicable specific date ascertainable for dating the oral offer;

that date was the culminating point of all previous efforts to buy the stock, and must be treated as the date the oral offer was made and the date the stock should have been transferred.

It may be well to point out that the valuation placed upon the stock by the State Department of Revenue is not binding upon us here, and we do not pass upon the propriety of that valuation. However, the option price under the agreement has been held controlling for Federal Estate Tax purposes in May v. McGowan, 2 Cir., 194 F.2d 396, reaffirming previous decisions; 51 Mich.L.R. 1; 62 Y.L.J. 832; and, apparently contra, Vol. 39 A.B.A. Journal 1106, December, 1953.

The judgment is reversed for proceedings consistent herewith.