RENDERED: APRIL 16, 2021; 10:00 A.M.
TO BE PUBLISHED

# Commonwealth of Kentucky

# Court of Appeals

NOS. 2019-CA-0634-MR
AND
2019-CA-0692-MR


KENNETH D. PARRISH,
DMD, PH.D., P.S.C.; AND
KENNETH D. PARRISH,
DMD, PH.D.                                      APPELLANTS/CROSS-APPELLEES


APPEAL AND CROSS-APPEAL FROM JEFFERSON CIRCUIT COURT
v.          HONORABLE ANN BAILEY SMITH, JUDGE
ACTION NO. 11-CI-04100


ROBERT SCHROERING, DMD;
AND ADVANCED IMPLANT
CENTER, P.S.C.                                  APPELLEES/CROSS-APPELLANTS


OPINION
REVERSING AND REMANDING APPEAL NO. 2019-CA-0634-MR
AND AFFIRMING CROSS-APPEAL NO. 2019-CA-0692-MR

** ** ** ** **

BEFORE: CLAYTON, CHIEF JUDGE; GOODWINE AND KRAMER,
JUDGES.

CLAYTON, CHIEF JUDGE:  Kenneth D. Parrish DMD, Ph.D, P.S.C., and

Kenneth D. Parrish DMD, Ph.D, ("Parrish") bring this appeal from the Jefferson

Circuit Court's trial order and judgment in a lawsuit against Robert Schroering,

DMD, and Advanced Implant Center, P.S.C.  ("Schroering").  Parrish and

Schroering were business partners in a dental implant practice. When Schroering

sought to retire in 2009, a lengthy and complex legal dispute ensued, culminating

in a trial in 2018.  The primary issue on appeal concerns the buyout price Parrish

was required to pay to Schroering for his share of the practice under the terms of

their Partnership Agreement ("Agreement").  The Agreement provided for the

price to be based on the average of the closest two of three expert evaluations.  The

jury found that the two closest appraisals, which when averaged resulted in a

negative value, were based on a demonstrable mistake of fact and awarded

$787,000 to Schroering.  Parrish argues that the valuation method set forth in the

Agreement was unambiguous and binding and the trial court erred in allowing the

appraisals to be assessed by the jury.  On cross-appeal, Schroering argues that the

trial court erred in allowing the jury independently to calculate the buyout price

rather than adopting the price set by the third appraiser.  He further argues that the

trial court erred in granting a directed verdict on his claims of breach of good faith

and fair dealing and breach of fiduciary duty.  Other disputed issues include the

amount of attorney's fees, pre- and post-judgment interest, and a monthly

allocation specified in the Agreement. Having reviewed the record and the arguments of counsel, we reverse and remand Appeal No. 2019-CA-0634-MR and affirm Cross-Appeal No. 2019-CA-0692-MR.

**Background**

In 1993, Schroering started a dental practice, Advanced Implant Center, P.S.C., specializing in dental implant surgery and periodontics. In 2004, Schroering advertised for an associate and ultimately hired Parrish, who became a partner in 2005. Parrish purchased fifty percent of the practice for $800,000 and assumed some short-term debt for approximately $180,000. Their partnership was governed by the lengthy (82-page) and complex Agreement.

Article 8 of the Agreement contains the provisions governing the retirement of a partner. A partner wishing to retire is required to provide two years' written notice. At the end of that period, the remaining, non-retiring party is immediately required to purchase all "Practice Interest" of the retiring party. Section (E) of Article 8, which is entitled Buyout Prices (Including Revalued Buyout Prices) Defined, sets the Buyout Price to be used to purchase the retiring partner's Practice Interests at $975,000. Additionally, the retiring partner is entitled to recover the fair market value of his interests in any Practice Interest acquired after the date of retirement, as determined by a certified public accounting firm. The final two sentences of the paragraph provide as follows: "Further, the

-3-

fair market value shall be determined without consideration of any 'marketability' or 'control' or similar discount. Finally, the growth or increase in value of the goodwill of the practice or Partnership shall not cause any increase in any Buyout Price."

A key point of contention in the subsequent litigation was whether this ban on the consideration of goodwill applies only to the calculation of the fair market value of the increase in Practice Interest acquired after retirement or if it applies to any Buyout Price, including the Revised Buyout Price detailed in the next paragraph.

The next paragraph states: "In supplement, and limitation" to the foregoing provisions of Section (E), "it is further agreed that any Buyout Price, as to any retiring Party, and its Shareholder, provided for hereinabove" shall be disregarded if the retiring party does not sell its Practice Interests to a third party. "In such event, the number of Parties and Shareholders shall be reduced, resulting in an unanticipated reduction in the value of the practice and Partnership, necessitating a revaluation of the Buyout Price[.]" In such an eventuality, the non-retiring party can choose to pay the Buyout Price of $975,000 or have the Buyout Price revalued. To arrive at the Revalued Buyout Price, the parties can agree on a single appraiser to revalue the practice or they can each retain their own appraiser to perform a valuation. These two appraisers will choose a third appraiser to

perform a third valuation.  The two closest appraisals of the three will be averaged

to arrive at the Revalued Buyout Price.  The Agreement describes the task of the

appraisers as follows:

> Such Appraiser, if mutually agreed upon and selected,
> and all of such Appraisers, if three (3) such Appraisers
> are so selected, shall utilize all documentation which may
> be deemed appropriate, as well as the expertise and
> experience of such Appraiser, or Appraisers, as well as
> the written and oral opinions and statements of others, as
> such Appraiser, or Appraisers, may deem appropriate,
> and may also utilize, rely upon, and consider published
> information, as such Appraiser, or Appraisers, may
> determine to be applicable, and, shall consider the effect
> of associates practicing in the practice, and especially any
> associates retained, employed, or otherwise engaged to
> practice in the practice, for the Partnership, or any of the
> Parties, within ninety (90) days of the retirement of the
> retiring Party, and its Shareholder, or otherwise retained,
> employed or engaged, specifically to replace the retiring
> Party, and its Shareholder, and, also shall especially
> consider the future earning potential, from the practice,
> as to the other Parties and Shareholders, subsequent to
> the retirement of the retiring Party and its Shareholder.

If the non-retiring party does not immediately pay the retiring party

the Buyout Price or the Revalued Buyout Price, the Agreement provides the

retiring party with "the right immediately monthly thereafter to continue to receive,

as sole consideration and compensation, the retiring Party's Share of the

Ownership Allocation . . . hereinafter called 'Monthly Share,' which shall continue

to be paid, for a period of ten (10) years subsequent to the date of the retirement."

The "Ownership Allocation" is defined in the Agreement as fifteen percent of the

total Practice Collections; hence, the retiring party in this case would receive 7.5 percent of the total Practice Collections. The Agreement specifies that the retiring party will continue to receive the Monthly Share either until the relevant buyout price is paid or ten years have elapsed.

On June 9, 2009, Schroering gave written notice to Parrish that he planned to retire, with a retirement date of June 9, 2011, in accordance with the Agreement. Schroering continued working in the practice and sought interested buyers for his interest. According to Schroering, Parrish discouraged and rejected these potential buyers. The relationship between Schroering and Parrish deteriorated, and Schroering decided to rescind his retirement notice. He sent Parrish a notice of rescission on December 9, 2009 and continued practicing in the partnership.

Then, on January 24, 2011, Schroering sent Parrish a second notice of retirement, which would have made his effective retirement date January 24, 2013. He continued to seek a purchaser for his interest in the partnership. According to Schroering, Parrish persisted in obstructing his candidates by treating them as inferiors and assigning them all the "lower work."

On March 28, 2011, Parrish notified Schroering that he intended to hold him to the June 9, 2011 retirement date. According to Schroering, at no time

before that had Parrish informed him that he would not accept the notice of rescission.

On June 13, 2011, Schroering filed a complaint against Parrish in Jefferson Circuit Court, seeking an accounting of the inventory of the practice. The complaint claimed that Parrish had rejected each potential third-party purchaser and, consequently, the method set forth in the Agreement (of using an appraiser or appraisers) would be used to calculate a Revalued Buyout Price. The complaint claimed that Parrish had prevented Schroering from conducting a physical inventory of their offices, and it sought a restraining order or temporary injunction to prevent Parrish from removing any assets from the offices.

Not surprisingly, Schroering and Parrish were unable to agree on a single appraiser and embarked upon the three-appraiser process prescribed by the Agreement. Schroering hired Harold Martin; Parrish hired David Fister. Fister and Martin, at the recommendation of Martin, selected James Lloyd as the third appraiser. The appraisers began the evaluation process in February 2012 and produced their final reports in July 2013.

There was a wide disparity in the valuations due to the different approaches used by the appraisers. Parrish's evaluator Fister and the third appraiser Lloyd used the asset approach of valuation, which calculates the difference between the tangible assets and liabilities of the business to determine

its value. Fister valued Schroering's fifty-percent interest in the practice at negative $77,179 and Lloyd valued it at $61,000. The reason for the discrepancy was that Fister subtracted over $171,000 in prepayments that Schroering had collected from patients from the value because the practice would either need to refund the payments or perform the work for free.

Schroering's appraiser, Martin, used an income approach to appraise the practice at $1,207,000. The income approach includes intangible assets and also considers future income to arrive at a value. Martin also provided an alternative appraisal using the asset approach to arrive at a value of $367,000.

Under the terms of the Agreement, the two closest appraisals, those of Fister and Lloyd, would be averaged, resulting in a Revalued Buyout Price of negative $8,089.50.

Both Fister's and Lloyd's reports cited as guidance for their valuations the provision from Section 8(E) of the Agreement, discussed above, which states that the fair market value of any practice interest

> shall be determined with consideration of any financing or indebtedness secured thereby, subject thereto, or otherwise allocable thereto, by a certified public accounting firm to be selected by the parties, which shall be binding on the parties and shareholders. Further, the fair market value shall be determined without consideration of any "marketability" or "control" or similar discount. Finally, the growth or increase in value of the goodwill of the practice or Partnership shall not cause any increase in any Buyout Price.

Martin's report was accompanied by a letter which discussed the disparity in the appraisals, stating in part as follows:

> In reaching an opinion of value . . . we considered the terms of the S&P [Schroering and Parrish] Partnership Agreement. However, because certain terms of the S&P Partnership Agreement are vague, the three appraisers interpreted the S&P Partnership Agreement differently. This resulted in the appraisers making different assumptions and applying different valuation approaches and methodologies which ultimately led to materially different conclusions.
>
> We understand that the other appraisers have elected to use an asset approach for purposes of valuing S&P. In order to have a common basis of comparison with the other appraisers and to meaningfully participate in the valuation process, we are presenting our opinion of the value of S&P based on the asset approach. Using the asset approach, the fair market value of AIC's [Advanced Implant Center] 50% ownership in S&P as of June 9, 2011, is **$367,000**. However, we should note that the estimate of value derived using an asset approach only considers the value of the Practice's net tangible assets and excludes consideration of the value of any intangible assets such as the value of the relationships with referring dentists, the assembled workforce, and practice goodwill. Further, the value derived under the asset approach fails to recognize the substantial income that has been realized by Dr. Parrish since Dr. Schroering's retirement and the future income that Dr. Parrish will continue to receive. Finally, the value derived using the asset approach results in an anomaly when this value is compared to the amount originally paid by Dr. Parrish to buy a 50% interest in S&P, approximately $800,000, as well as the value assigned to a 50% interest by the S&P Partnership Agreement, $975,000.

Notwithstanding the foregoing, given the terms of the S&P Partnership Agreement and the actual characteristics of the Practice, the most appropriate approach for valuing S&P should have been the income approach. Using the income approach, the fair market value of AIC's 50% ownership interest in S&P as of June 9, 2011, is $1,207,000. This value includes the value of intangible assets and, further, considers the future income that will be realized by the Practice.

The litigation meanwhile continued and expanded in scope. Schroering amended his complaint to add claims for fraud, breach of fiduciary duties as a partner, breach of the implied covenant of good faith and fair dealing, breach of contract, defamation, unjust enrichment, and damage to property. In his third amended complaint, filed on September 11, 2013, Schroering alleged Parrish had a scheme for improperly influencing the value of the partnership and directly challenged the appraisals on that basis. Parrish filed numerous counterclaims and amendments, alleging breach of contract, conversion, fraud and intentional misrepresentation, and unjust enrichment. On May 23, 2016, Schroering filed a fourth amended complaint adding a claim to set aside the Fister and Lloyd appraisals.

Parrish and Schroering filed cross-motions for summary judgment regarding the proper valuation method and final valuation of the practice, both of which the trial court denied. One of the issues raised was whether the Agreement required the appraisers to factor into their appraisals the income-producing effect

of any associates or of the practice's future earning potential. The trial court concluded that the Agreement only required the appraisers to "consider" these factors. It further stated: "It is indisputable that Fister and Lloyd considered Martin's opinion on this issue and concluded, reasonably or not, that the asset approach to valuation was called for. Lloyd and Fister stated specific reasons supporting their valuation approach, reasons that create genuine issues of material fact for the jury to decide and precluding the Court from disagreeing with their conclusions as a matter of law." Record ("R.") at 5690.

Parrish thereafter petitioned the Court of Appeals for a writ to prohibit the circuit court from enforcing its order denying the summary judgment and allowing the question of the value of the dental practice to go to the jury. The petition sought to compel the circuit court to enter an order enforcing the terms of the Agreement designating how that value was to be determined on the grounds that it was a binding, enforceable arbitration agreement. *Parrish v. Smith*, No. 2016-SC-000582-MR, 2017 WL 3632911, at *1-2 (Ky. Aug. 24, 2017). This Court denied the writ, and the Kentucky Supreme Court affirmed, stating in part:

> By the plain language of the Agreement [referring specifically to Section 8(E)], the parties agreed to be bound by the average amount of the appraised values, but in no way did the parties agree that this valuation would constitute a final arbitration, or to submit any dispute to arbitration, especially regarding issues other than the revalued buyout price.

-11-

> . . . An agreement to abide by the averaged
> appraisal value of the two closest appraisers is
> fundamentally different than the appraisers acting as
> binding arbitrators of the Agreement. . . .
>
> . . . Since this Agreement does not contain a
> binding arbitration clause, Parrish has not established that
> the Court of Appeals and circuit court acted erroneously
> in allowing this question of valuation to go to a jury.

*Id.* at *3.

Thus, the Kentucky Supreme Court ruled that while the parties agreed to be "bound" by the average of the two closest appraisals, they did not agree that this amount constituted a final arbitration and, consequently, a jury could be permitted to review the appraisals. Accordingly, the trial court ruled, in an order entered on January 26, 2018, that while the appraisals by Fister and Lloyd were valid and binding under the terms of the Partnership Agreement, they could be set aside if a jury found they were reached "arbitrarily, dishonestly, or under a demonstrable mistake of fact." R. at 8196.

A trial was held from August 28 through September 10, 2018, during the course of which the trial court entered a directed verdict against Schroering on his claims of breach of fiduciary duty, fraud, and breach of the covenant of good faith and fair dealing. According to Schroering's expert witness Mark Dietrich, Fister and Lloyd's asset-based approach led them to ignore the value of various intangibles such as future income, the referral base, the trained workforce, a non-

-12-

compete agreement from Schroering, and most significantly, the practice's goodwill. The parties moved for directed verdicts on the issue of whether the Partnership Agreement prohibited the appraisers from considering the value of goodwill in determining the Revalued Buyout Price. On September 10, 2018, the trial court entered an order interpreting Section 8(E). It found that no ambiguity existed in the provision and held that the goodwill limitation applied only to determining the fair market value of any Practice Interest component of the "Buyout Price" of $975,000 and did not apply to the Revalued Buyout Price.

The trial court's order states in part:

This conclusion is firmly supported by the first sentence in the very next paragraph, which contains a "supplement and limitation, to the foregoing provisions of this E of this Article 8," to the extent that "any Buyout Price . . . shall be disregarded, if all, or substantially all, of" Schroering's "Practice Interests are not sold to a third party . . ." When no sale occurs, which is what happened in this case, this provision "necessitate[es] a revaluation of the Buyout Price applicable to the retiring . . . Shareholder . . . at the election of the other . . . Shareholder." The provisions that continue in this same paragraph, for a full two pages, dictate the revalued appraisal procedure that has played out in this case. Nowhere in these revalued appraisal provisions are the "Appraisers" prohibited from valuing goodwill. To the contrary, these provisions give the Appraisers great leeway, only requiring them, among other things, to "utilize all documentation which may be deemed appropriate, as well as the expertise and experience of such Appraisers" and to "consider the effects of associates practicing in the practice . . . and" to "especially consider the future earning potential from the

-13-

practice, as to the other . . . Shareholders." The fact that no goodwill limitation is placed on the Appraisers in the revalued appraisal provisions inexorably leads the Court to conclude that the Partnership Agreement intended no such limitation.

The Court fully understands that . . . Fister and Lloyd interpreted the Partnership Agreement differently and rendered their appraisals in accordance with their interpretation of it, at least in part. Whether they arrived at this interpretation arbitrarily or due to a demonstrable mistake of fact is for the jury to decide.

The jury instructions incorporated this holding and provided in pertinent part as follows:

INSTRUCTION NO. 4

The Court has ruled that Section 8, Paragraph E of the Partnership Agreement does not limit or otherwise prohibit an appraiser from valuing the goodwill of the Partnership when conducting its valuation of the revalued buyout price. In rendering your verdicts to Instruction No. 5 and Instruction No. 6, in addition to the other evidence presented in this case you may consider whether Mr. Fister and Mr. Lloyd interpreted this contract provision arbitrarily or due to a demonstrable mistake of fact.

INSTRUCTION NO. 5

The appraisals of the revalued buyout price of the practice prepared by Mr. Fister and Mr. Lloyd are binding upon Dr. Schroering and Dr. Parrish unless you believe from the evidence that Mr. Fister and Mr. Lloyd arrived at their conclusions in their appraisals arbitrarily. The appraisers would have acted arbitrarily if their actions were clearly erroneous, and clearly erroneous means unsupported by substantial evidence. Substantial

-14-

evidence means evidence of substance and relevant consequence having the fitness to induce conviction in the minds of reasonable people.

Do you believe from the evidence that Mr. Fister and Mr. Lloyd arrived at the conclusions in their appraisals arbitrarily?

The jury answered this instruction in the negative.

## INSTRUCTION NO. 6

The appraisals of the revalued buyout price of the practice prepared by Mr. Fister and Mr. Lloyd are binding upon Dr. Schroering and Dr. Parrish unless you believe from the evidence that Mr. Fister and Mr. Lloyd arrived at the conclusions in their appraisals due to a demonstrable mistake of fact. To constitute a demonstrable mistake of fact, the mistake must be of such character that a reasonable appraiser would correct it when it is called to his attention.

Do you believe from the evidence that Mr. Fister and Mr. Lloyd arrived at the conclusions in their appraisals due to a demonstrable mistake of fact?

The jury answered this instruction in the affirmative.

## INSTRUCTION NO. 7

If you answered yes to either Instruction No. 5 or Instruction No. 6, or both, you shall disregard the appraisals of Mr. Fister and Mr. Lloyd and determine from the remaining evidence the amount of the revalued buyout price of the practice in an amount not to exceed $1,207,000. In arriving at this amount, in addition to the other evidence presented in this case you may consider

whether the value of the goodwill of the practice is to be
included in the revalued buyout price.

The jury found the amount of the revalued buyout of the practice to be $787,000.

Following the trial, Schroering filed a fifth amended complaint seeking attorney's fees under the Agreement. The parties briefed the issue, and the trial court awarded $463,623.98 in attorney's fees to Schroering. The trial court then entered a judgment against Parrish totaling $1,250,624.98. This appeal and cross-appeal followed.

**Analysis**

Parrish raises three main arguments: (1) the trial court erred as a matter of law in allowing the jury to review the appraisals of the practice; (2) the jury instructions were erroneous and resulted in a verdict unsupported by the law or the evidence; and (3) the award of attorney's fees was inflated and not commensurate with the success of Schroering's claims. Because we agree that the trial court erred as a matter of law in allowing the jury to review the appraisals of the practice, due to the insufficiency of the evidence, the latter two arguments are rendered moot.

On cross-appeal, Schroering argues the trial court erred (1) in not awarding him damages in the amount of Martin's appraisal of $1,207,000, or in the alternative, the Buyout Price of $975,000; (2) in dismissing his claims for breach of the covenant of good faith and fair dealing and breach of fiduciary duty; (3) in

-16-

failing to award him all costs, expenses, and attorney's fees, and appropriate pre- and post-judgment interest; and (4) in not awarding him the Monthly Allocation for ten years and in excluding evidence of the Monthly Allocation at trial. Schroering's first and fourth arguments are rendered moot by our holding in this case. His second argument is reviewed below, and the issue of attorney's fees and costs is remanded for further consideration by the trial court.

**Judicial Estoppel**

As a preliminary matter, Parrish contends that Schroering should have been judicially estopped from disputing the appraisals because he raised the issue for the first time several years after the commencement of the litigation. As further evidence of Schroering's dilatoriness, Parrish points to Schroering's response to a motion for summary judgment made more than a year after the appraisals were complete, in which Schroering expressly stated he had not sought to set the valuations aside.

"The doctrine of judicial estoppel evolved as an equitable principle intended to protect the integrity of the judicial process by prohibiting a party from taking inconsistent positions in judicial proceedings." *Mefford v. Norton Hospitals., Inc.*, 507 S.W.3d 580, 584 (Ky. App. 2016) (citation omitted). On the other hand, the consequences of judicial estoppel are "harsh and may bind a party

-17-

to a position without regard to the truth-seeking function of the court." *Id.* (internal quotation marks and citation omitted).

The trial court invokes this equitable doctrine at its discretion. *Hisle v. Lexington-Fayette Urban County Government*, 258 S.W.3d 422, 434-35 (Ky. App. 2008). The factors it may consider in exercising its discretion include the following: "(1) whether the party's later position is clearly inconsistent with its earlier position; (2) whether the party succeeded in persuading a court to accept the earlier position; and (3) whether the party seeking to assert an inconsistent position would derive an unfair advantage or impose an unfair detriment on the opposing party if not estopped." *Id.*

Schroering contends that none of these factors was present to justify the exercise of judicial estoppel by the trial court. He contends that Parrish manipulated and provided false information to his appraiser and that Fister and Lloyd made patent errors based in part on this false information, resulting in an improper valuation. He contends that he challenged the appraisals as soon as he became aware of this situation.

Schroering could not have challenged the appraisals until after they were complete. The appraisers' final reports were submitted in July 2013, approximately two years after he filed his complaint. Our review of the record indicates that in his third amended complaint, filed on September 11, 2013,

Schroering alleged misconduct within the Revalued Buyout Price valuation. Although the basis of his attacks shifted over time, they remained consistent with his earlier claims against Parrish. In light of the complex and evolving nature of the litigation, the trial court did not abuse its discretion by not invoking judicial estoppel to prevent the litigation of claims relating to the soundness of the appraisals.

### The Validity of the Appraisals

Parrish argues that Schroering's challenge to the Lloyd and Fister appraisals was based on their decision to use an asset-based rather than an income-based approach to the valuation of the practice. He contends that this attack on their professional methodology constituted insufficient grounds to set aside their appraisals because the Agreement is an unambiguous contract which does not specify a particular appraisal method.

Although there is no Kentucky case expressly setting forth the standard for judicial review of a contractually mandated appraisal, the trial court relied on *Green River Steel Corporation v. Globe Erection Company*, 294 S.W.2d 507 (Ky. 1956), which involved a dispute over a contract between a construction company and a steel corporation to build a steel mill. The construction company sued for damages stemming from the extra time it needed to build the mill because of errors and mistakes in the drawings and specifications provided by the

corporation. The contract provided that the decision of the architect or engineer as to what did or did not constitute "extra work" was binding. The construction engineer testified that the work was done within the terms of the contract. The opinion held that in the absence of arbitrariness, dishonesty, or mistake, his judgment was controlling, stating: "It is the general rule that the decision of the architect or engineer as to what does or does not constitute extra work, where the contract, as it does here, provides that his decision shall be final and binding, is conclusive and controlling on both the owner and the builder, unless he acts arbitrarily, dishonestly, or under a demonstrable mistake of fact." *Id*. at 511 (citations omitted).

Other Kentucky cases cited by Parrish set forth a similar standard. In *Krebs v. McDonald's Executrix*, 266 S.W.2d 87 (Ky. 1953), for example, the Court held a contractual agreement amongst shareholders regarding a stock valuation could not be set aside without a showing of "fraud, mistake, or concealment" such as "to render it plainly inequitable and against conscience that the contract should be enforced." *Id*. at 90 (citation omitted). An early Kentucky opinion states: "[W]here a contract provides for a settlement of disputed items, arising under such contract, by means of a determination through an outside authority, the subsequent determination by such authority upon the questionable items is, in the absence of a

showing of fraud or mistake, binding upon the parties to the contract." *National*

*Tool & Die Co. v. Wrege*, 307 Ky. 568, 570, 210 S.W.2d 924, 925 (1948).

This standard is consonant with that applied in other jurisdictions,

which commonly require a showing of fraud, bad faith, material mistake, or some

combination of these to challenge a contractual appraisal provision.  The Court of

Appeals for the Sixth Circuit has stated that "[g]enerally, a court will not interfere

with an appraisal award but, to the contrary, will indulge in every reasonable

presumption to sustain it in the absence of fraud, mistake, or misfeasance."

*Lakewood Mfg. Co. v. Home Ins. Co. of New York*, 422 F.2d 796, 798 (6th Cir.

1970).  This holding was echoed by the Supreme Court of Iowa, stating that an

"award will not be set aside unless the complaining party shows fraud, mistake or

misfeasance on the part of an appraiser or umpire."  *Walnut Creek Townhome*

*Ass'n v. Depositors Ins. Co.*, 913 N.W.2d 80, 89 (Iowa 2018) (citation omitted).

The rationale for this approach is rooted in judicial deference to

contractual agreements:

> The court's role is not to determine whether the third
> party [appraisers] accurately valued the item (as if the
> court itself could do a better job), but whether the third
> party experts understood and carried out the contractually
> assigned task.  The obvious point of contracting for an
> appraisal process is to keep a jury or court out of that
> decision.  Courts have an obligation to enforce this aspect
> of an agreement between the parties by asserting only
> limited power to review appraisal awards.

*Calais Co., Inc. v. Ivy*, 303 P.3d 410, 416 (Alaska 2013) (quoting *Farmers Auto.*

*Ins. Ass'n v. Union Pacific Ry. Co.*, 768 N.W.2d 596, 607 (Wis. 2009)).

It is well-established in Kentucky "that a court cannot make a contract

for the parties, but can only construe the contract it finds they have entered into[,]"

and does not have "the authority to read words into a contract." *Sandy Company,*

*L.P. v. EQT Gathering, LLC*, 545 S.W.3d 842, 847 (Ky. 2018) (citation omitted).

A court is not permitted to insert into the contract "terms and conditions the parties

never intended[.]" *Id.*

Thus, "although appraisals are presumptively valid and should not be

lightly set aside, an appraisal may be set aside upon a showing of fraud, bad faith, a

material mistake, or *a lack of understanding or completion of the contractually*

*assigned task.*" *Calais*, 303 P.3d at 416-17 (emphasis in original) (citation

omitted). "Courts in the District of Columbia, Iowa, Massachusetts, and Texas

have reached similar conclusions and reviewed appraisals for fraud, bad faith,

mistake, or failure to complete the appraisal according to the contractually

prescribed appraisal procedures." *Id.* at 417 (footnote omitted).

In the case before us, Schroering argued that Fister and Lloyd

misinterpreted Section 8(E) of the Agreement and proceeded on the mistaken

assumption that goodwill could not be considered as part of the appraisal process.

Consequently, they believed that an asset approach was mandated by the

Agreement. According to Schroering, this approach to the valuation led Fister and Lloyd to ignore a host of intangibles which should have been included in the valuation, such as the practice's referral base, the trained workforce, and the future income of the practice. Thus, the demonstrable mistake of fact was really an alleged failure to conduct the appraisal in accordance with the Agreement, rather than a mistake of the type addressed in *Elswick v. Justice*, in which an appraisal was set aside because the appraisers mistakenly valued only 80 acres whereas the commissioner sold 176 acres. 287 Ky. 632, 154 S.W.2d 714, 715 (1941).

But there is no indication that Fister and Lloyd chose to perform asset-based appraisals based on their misinterpretation of Section 8(E). Both Fister and Lloyd explained that they chose an asset approach because the practice had insufficient cash flow to justify an income approach. Lloyd testified that the annual revenue of the practice was approximately $3 million. Fifty percent of this revenue went to the doctors' compensation and the other fifty percent to overhead such as operating expenses for the offices and staff. He further explained that the practice generated a very large amount of revenue from seminars presented by the doctors. In 2010, for instance, over $300,000 was generated from the seminars. He testified that this seminar revenue was not typically part of the operations of a normal practice, so he eliminated it from his valuation. He testified that if the seminar revenue was eliminated, the actual practice profit was negative. On this

basis he concluded that "we could not use an income approach in this particular case."

Lloyd's report similarly stated that the practice had insufficient cash flow (besides the doctors' compensation) to utilize the income approach.

Although Martin and Dietrich opined that the asset approach should only be applied to calculate the liquidation value of a business and not to a going concern, Fister and Lloyd's rationale for applying the asset approach is not a demonstrable mistake of fact. Lloyd testified that the asset approach is commonly used to value physicians' practices, particularly specialty practices whose revenue is based on the physicians' personal efforts.

Schroering also argues that Fister and Lloyd ignored the directive in the Agreement that the appraisers consider the future earning potential from the practice. It is clear, however, as the trial court explained in an earlier ruling interpreting the language of the Agreement, that this is a recommendation only and not mandatory. In any event, the record contains no evidence Fister and Lloyd failed to consider potential future income. Lloyd specifically testified he did consider it but rejected it because the significant seminar income was not a sustainable cash flow.

Martin and Dietrich never claimed that the asset approach to valuation is innately invalid, simply that it was not appropriate in this case. Fister and

Lloyd's decision to adopt the asset approach was similarly founded in their professional judgment and cannot be described as a demonstrable mistake of fact. There was no evidence of a demonstrable mistake of fact which would justify setting aside the appraisals which were conducted in full accordance with the terms of the Agreement.

Our decision is consistent with the directive of the Kentucky Supreme Court in *Parrish v. Smith*, 2017-WL-3632911, *supra*, that the appraisals and the appraisal process were subject to review by a jury. The Court did not, however, provide the parameters for that review. The trial court applied the standard set forth in *Green River Steel Corporation*, *supra*, which fully accords with the standard applied in other jurisdictions for setting aside a contractually mandated appraisal. That standard was not met in this case.

**The Directed Verdict on Schroering's Other Claims**

Schroering argues that the trial court erred in granting a directed verdict on his claims of breach of the covenant of good faith and fair dealing and breach of fiduciary duty.

A directed verdict is granted on a claim only when "there is a complete absence of proof on a material issue or if no disputed issues of fact exist upon which reasonable minds could differ." *Toler v. Süd-Chemie, Inc.*, 458 S.W.3d 276, 285 (Ky. 2014), *as corrected* (Apr. 7, 2015) (citation omitted). The

trial court granted Parrish's motion for a directed verdict on Schroering's claims of fraud, breach of the covenant of fair dealing, and breach of fiduciary duty after applying the appropriate directed verdict standard because Schroering had offered no proof of the essential element of damages. The trial court observed that Schroering had made no claim for damages and offered no proof or dollar amount of damages for these claims.

Schroering argues that the record is replete with evidence supporting his claims, including that Parrish gave false numbers to the appraisers, falsely claimed Schroering had drained practice accounts while doing so himself, delayed in notifying Schroering he would not allow the rescission of his original retirement date, rejected or created a hostile environment for replacement candidates, and locked Schroering out of the practice's office. Schroering does not, however, address the basis of the trial court's decision to grant the directed verdict and does not provide a reference to the record to indicate where he offered proof of damages. Hence, the trial court's grant of a directed verdict on these claims is affirmed.

### Attorney's Fees and Costs

In regard to attorney's fees and costs, Article 17(D) of the Partnership Agreement provides: "If any action at law or in equity is necessary to enforce the terms of this Agreement, the prevailing Party or Parties, or Shareholder or

Shareholders, shall be entitled to reasonable attorneys fees and costs, in addition to any other relief to which entitled." Following the trial and verdict, Schroering moved for attorney's fees pursuant to this provision of the Agreement and filed a bill of costs and memorandum claiming total costs and attorney's fees of $827,513.67. The defendants objected, and the trial court heard oral arguments on the matter. The trial court thereafter granted the plaintiffs a total of $463,623.98 in attorney's fees and costs. Because the judgment is being reversed, this award of attorney's fees and costs is vacated, and the matter is remanded to the trial court for reconsideration.

### The Monthly Share and Pre- and Post-Judgment Interest

Schroering argues that Parrish was required to pay him the Monthly Share in accordance with the Agreement for a total of ten years.

In 2013, the trial court granted summary judgment in favor of Schroering to the extent the Monthly Share was granted to him for 120 days, which was the period specified in the Agreement for the appraisals to be completed. The trial court thereafter modified its order because of delays in the appraisal process. Ultimately, it ordered Parrish to pay Schroering the Monthly Share from the date of his retirement until the appraisers completed their work, with an offset for delays caused by Schroering. The trial court calculated this period to be for the months of July through October 2011 and the months of March through June 2013.

It entered an order on September 23, 2013, ordering Parrish to pay Schroering to pay a total of $87,467.

The trial court later ruled that Schroering would be permitted to argue at trial that he was entitled to additional Monthly Share allocations. It set aside this ruling in its order of January 26, 2018, however, and reaffirmed the earlier grant of summary judgment on this issue. Its decision was founded on its earlier interpretation of the Agreement that the Monthly Share was intended to be paid from the effective date of retirement until the completion of the appraisal process when Parrish would pay the Revalued Buyout Price. The trial court found "no provision in the [A]greement that supports a finding that the monthly payments should continue if Schroering refuses to accept Parrish's offer of payment, however unreasonable that payment might be." R. at 8198. The trial court's interpretation of the Agreement in this regard is well-founded, and its decision is affirmed.

Schroering is not entitled to pre- or post-judgment interest.

**Conclusion**

For the foregoing reasons, as to Appeal No. 2019-CA-0634-MR, we reverse the trial order and judgment of the Jefferson Circuit Court and vacate the award of attorney's fees and costs. The case is remanded to the trial court (1) to average the Fister and Lloyd appraisals in accordance with the terms of the

-28-

Agreement and to enter a judgment to reflect this amount; and (2) to reconsider the award of attorney's fees and costs.  As to Cross-Appeal No. 2019-CA-0692-MR, we affirm.


ALL CONCUR.


BRIEFS FOR APPELLANTS/
CROSS-APPELLEES:

Charles J. Cronan, IV
Chadwick A. McTighe
Michael W. Oyler
Ridley M. Sandidge, Jr.
Louisville, Kentucky


ORAL ARGUMENT FOR
APPELLANTS/
CROSS-APPELLEES:

Chadwick A. McTighe
Louisville, Kentucky

BRIEFS FOR APPELLEES/
CROSS-APPELLANTS:

Gregg Y. Neal
Taylor P. Sorrels
Shelbyville, Kentucky


Kevin C. Burke
Jamie K. Neal
Louisville, Kentucky


ORAL ARGUMENT FOR
APPELLEES/
CROSS-APPELLANTS:

Gregg Y. Neal
Shelbyville, Kentucky